Rachel STORMS, a Minor by her Parents and Natural Guardians, Sean STORMS and Wendy Storms, and Sean Storms and Wendy Storms, Individually,

v.

Thomas O'MALLEY, M.D., Dorko, Adams & Janson Associates and Harrisburg Hospital.

Appeal of Pennsylvania Medical Professional Liability Catastrophe Loss Fund, Intervenor, (At 1510)

Rachael Storms, a Minor by her Parents and Natural Guardians, Sean Storms and Wendy Storms, and Sean Storms and Wendy Storms, Individually,

v.

Thomas O'Malley, M.D., Dorko, Adams & Janson Associates and Harrisburg Hospital.

Appeal of Thomas O'Malley, M.D. and Dorko, Adams & Janson Associates and Pennsylvania Property and Casualty Insurance Guaranty Association, Intervenor. (At 1509)

Superior Court of Pennsylvania.

Argued May 11, 1999.
Decided June 20, 2001.

Guy A. Donatelli, West Chester, for Pennsylvania Medical Prof. Liability Catastrophe Loss Fund.

Pamela G. Shuman, Harrisburg, for Storms.

Linda P. Sweeney, Lancaster, for O'Malley.

Teresa F. Sachs, Philadelphia, for Pennsylvania Property and Cas. Ins. Guaranty Assn.

Before: POPOVICH, ORIE MELVIN and BROSKY, JJ.

POPOVICH, J.

¶ 1 These consolidated appeals stem from the order entered in the Court of Common Pleas of Dauphin County on August 31, 1998, which granted the motion to compel compliance with the parties' settlement agreement filed by appellees, Rachel Storms, a minor, and Sean and Wendy Storms, Rachel's parents, and denied the motion to seal the record filed by appellant Dr. Thomas O'Malley. The lower court's order provided as follows:

AND NOW, this 31st day of August 1998, following two days of testimony, attempted mediation, and briefs filed by parties, upon motion to compel compliance with settlement agreement, and motion to seal the settlement and the record, the motion to seal the record and settlement is hereby denied and it is further ordered that the settlement approved by this Court by July 15, 1998 court order in the amount certain of $806,358 is affirmed.

Defendant Harrisburg Hospital and its insurance company have paid $5,000 in settlement of its contribution to this amount. The remaining Defendants, Dr. Thomas O'Malley, insured by Pennsylvania Insurance Guaranty Association (PIGA), due to the insolvency of Physicians' Insurance, remains responsible for the balance of $801,358. Settlement shall be paid on behalf of Defendant O'Malley from his two sources of insurance coverage, PIGA and the Medical Catastrophe Loss Fund (CAT).

PIGA shall remit $173,835 ($200,000—$26,165) to Plaintiffs on or before noon September 1, 1998. The CAT fund and/or PIGA shall remit the balance of $234,896 ($208,731 + $26,165) to Plaintiffs on or before noon December 31, 1998, cash or money order with the balance of $392,627 for the purchase of an insured annuity for the structured settlement, which material terms were reached and approved by this Court in chambers on or about June 24, 1998 and approved by Court Order on July 15, 1998.

The CAT fund shall provide any statutorily required Release, absent any provisions for confidentiality, to Plaintiffs.

PIGA's request to deduct a statutory setoff under 40 P.S. Section 991.1801, et seq. as to Plaintiffs is denied inasmuch as Defendant agreed to settle the above-captioned case in the amount certain of $806,358 on or about June 24, 1998 in this Court's chambers without any deduction therefrom for said statutory setoff. Inasmuch as the issue of the $26,165 setoff remains, litigation between the CAT fund and PIGA may lie with this Court and/or the Commonwealth Court.

Inasmuch as the CAT fund fiscal year ends August 31, 1998, time is of the essence for compliance with the Court's Order.

¶ 2 Upon review, we find that the lower court erred when it determined that either Pennsylvania Property and Casualty Insurance Guaranty Association (PPCIGA) or the Pennsylvania Medical Professional Liability Catastrophe Loss Fund (CAT Fund) was responsible to remit the sum of $26,165, the statutory setoff to which PPCIGA was entitled. Nevertheless, we find that the settlement agreement was enforceable, albeit based upon slightly different terms from those set forth by the

lower court. Finally, we agree with the lower court's refusal to seal the record and find that action of the lower court does not invalidate the settlement agreement, as sealing of the record was not an essential term of the parties' settlement agreement. Accordingly, we affirm the lower court's order in part and vacate in part.

¶ 3 At Docket Number 01509HBG98, Dr. O'Malley has appealed and first argues that there was no settlement reached under the terms set forth by the Storms and adopted by the lower court because PPCIGA was not permitted to apply its statutory offset. He also submits that he, PPCIGA and the CAT Fund were denied procedural due process in this case because the lower court approved the petition for settlement without providing them the opportunity to respond to the petition and argue issues related to the settlement, especially that of PPCIGA's right to a statutory offset of related insurance payments made on behalf of the Storms. Finally, Dr. O'Malley claims that the lower court erred when it refused to seal the record in this case.

¶ 4 At the same docket number, PPCIGA has also appealed and first argues that it is entitled to a statutory offset of other insurance payments made on behalf of the Storms in accordance with 40 Pa.C.S.A. § 991.1817(a). Second, it argues that its right to the offset cannot be waived, and, even if the offset is waivable, it was not waived under the facts of this case. Finally, like Dr. O'Malley, PPCIGA submits that there was no meeting of the minds with regard to material terms of the settlement agreement if we agree with the lower court that PPCIGA is not entitled to the statutory offset.

¶ 5 At Docket Number 01510HBG98, the CAT Fund has appealed and first argues that PPCIGA is entitled to its statutory offset, and the CAT Fund is statutorily prevented from paying the Storms the amount of PPCIGA's offset. Also, the CAT Fund suggests that there was no settlement because the Storms refused to execute a general release which contained a confidentiality provision, the specific language of which the Storms found objectionable.

¶ 6 In response to these appeals, the Storms state that there was a valid and enforceable settlement agreement, that PPCIGA waived its right to the statutory offset by not expressly raising the claim during settlement negotiations and that, even if PPCIGA is entitled to the offset, either the CAT Fund or Dr. O'Malley personally must make up that amount. The Storms also claim that the defendants waived their right to raise their claims by failing to object to the Storms' motion to approve the settlement of a minor's claim.

¶ 7 A full recitation of the procedural history of this case is warranted: Sean and Wendy Storms, on behalf of themselves and their minor daughter, Rachel, instituted this medical malpractice action against Dr. O'Malley in 1996. In October of 1997, Dr. O'Malley's primary medical malpractice insurance carrier, Physicians Insurance Company (PIC), contacted the attorney it retained to represent the doctor in this matter, Linda Porr Sweeny, Esquire. PIC informed her that it would tender the maximum amount recoverable under its policy, $200,000. The CAT Fund, which was liable for any damage award beyond the doctor's primary malpractice insurance policy limits, then assumed responsibility for the doctor's defense.[1]

---

1. Created by the Healthcare Service Malpractice Act, the CAT Fund is a non-party statutory excess carrier. To the extent that a health care provider's liability exceeds his basic coverage insurance in effect at the time of the occurrence, the CAT Fund, at the time of this

¶ 8 On January 21, 1998, Physicians Insurance Company became insolvent and a three-month stay of all proceedings, including the Storms' action against Dr. O'Malley, ensued. PPCIGA was then deemed the insurer and assumed all rights, duties and obligations of PIC as if that insurer had not become insolvent, subject to certain maximum statutory limits.[2] Attorney Sweeney forwarded a form letter to the Storms' counsel on May 15, 1998, and informed the Storms of PPCIGA's involvement. She indicated that PPCIGA would assert its statutory offset right as set forth in § 1817(a) of the Pennsylvania Property and Casualty Insurance Guarantee Act, which provides:

> Any person having a claim under an insurance policy shall be required to exhaust his right under such policy. For purposes of this section, a claim under an insurance policy shall include a claim under any kind of insurance, whether it is first-party or third-party claim, and shall include, without limitation, accident and health insurance, worker's compensation, Blue Cross and Blue Shield and all other coverages except for policies on an insolvent insurer. Any amount payable on a covered claim under this act shall be reduced by the amount of any recovery under other insurance.

¶ 9 Attorney Sweeny requested a list of all insurance claims made by the Storms for Rachel's injury and asserted that if the information was not forthcoming, she would file interrogatories. Additionally, she informed the Storms that PPCIGA would seek to amend its new matter to assert its offset right as an affirmative defense. The Storms replied in writing that the offset issue was irrelevant because Dr. O'Malley would be personally liable for any gaps in coverage created by PPCIGA's offsets. The Storms posited that the PPCIG Act did not protect the insured from being liable for the full amount of any judgment or settlement and, therefore, planned to object to discovery of any collateral insurance sources. Also, the Storms noted that the Act was possibly invalid since an attorney representing both PPCIGA and the insured would have a conflict of interest with the insured once it asserted PPCIGA's offset right. Attorney Sweeny did not respond to this letter, nor did she file interrogatories. Attorney Sweeny then filed the new matter in which she raised PPCIGA's statutory right to a setoff. However, when she did so, she failed to seek the leave of the trial court and, thus, failed to comply with our Rules of Civil Procedure.[3]

¶ 10 This case was set for trial for the week of June 22, 1998, and the Honorable Jeanine Turgeon supervised a pretrial settlement conference on June 23, 1998. The lawyers who attended the conference included: Attorney Sweeny; the attorney for Harrisburg Hospital, Evan Black; and the Storms' attorneys, Pamela Shuman

action, provided an additional $1,000,000 in excess medical malpractice insurance coverage. *See* 40 P.S. § 1301.701(d) (amended 1996, Nov. 26, P.L. 776, No. 135, § 3, imd. effective).

2. PPCIGA was created by the Pennsylvania Property and Casualty Insurance Guaranty Act. *See* 40 P.S. § 991.1801 *et seq.* Its purpose is to provide a means to pay covered claims under certain property and casualty insurance policies, to avoid excessive delay in the payment of such claims and to avoid financial loss to claimants or policyholders as a result of the insolvency of an insurer. 40 Pa.C.S.A. § 991.1801.

3. The record reveals that counsel for the Storms moved to strike the new matter because it failed to comport with the Rules of Civil Procedure. However, apparently, the court and the parties believed that a settlement had been reached before the court ruled on the motion.

and Neil Rovner. PPCIGA and the CAT Fund were not independently represented at the settlement conference.[4]

¶ 11 Throughout the settlement conference, Attorneys Sweeny and Shuman consulted with the CAT Fund employees as to the proposed settlement structure. The parties reached a settlement that day. Specifically, Attorney Sweeny offered $801,358 to settle the Storms' claims against Dr. O'Malley. The settlement structure provided that the Storms would receive a lump sum cash payment in the amount of $431,731 and the balance of $ 392,697 to purchase a bonded annuity. Upon the petition of the Storms, the court approved the settlement of Rachel's claim in the amount of $806,358 upon the Storms' petition. However, neither Dr. O'Malley nor his insurers tendered payment.[5]

¶ 12 Instead, Attorney Sweeny mailed a proposed release to the Storms, which she requested they sign and return. The release stated the PPCIGA would pay $ 173,835 to the Storms and that the CAT Fund would pay $ 208,731 in cash and purchase an annuity for $ 392,627. Attorney Sweeny claimed that the amount payable by PPCIGA represented the policy limits of Dr. O'Malley's former policy less medical expenses of $26,165, which were paid by other insurers on behalf of the Storms. The release also required that the Storms agree to sealing of the record.

¶ 13 Dissatisfied, the Storms then filed a motion to compel settlement in the full amount agreed to at the conference, and PPCIGA and the CAT Fund filed motions to intervene. The court granted PPCIGA

and the CAT Fund's motions and then heard oral arguments on the motion to compel settlement. Ultimately, it granted the Storms' motion to compel settlement, denied appellees' request to offset the Storms' recovery by the amount they recovered from other insurers and refused to seal the record. Dr. O'Malley, PPCIGA and the CAT Fund then filed timely appeals to our court.

¶ 14 Turning to our analysis of the issues presented, we first will address the two procedural issues raised by the parties. The Storms argue that the settlement as approved by the lower court should be affirmed since the appellants did not file objections to their petition to approve the settlement of a minor's claim. The Storms filed their petition on or about July 2, 1998, and the court approved the settlement by order dated July 15, 1998. Appellants never objected to the petition.

¶ 15 Pa.R.C.P. 2039(a) provides: "No action to which a minor is a party shall be compromised, settled or discontinued except after approval by the court pursuant to a petition presented by the guardian of the minor." In regards to approval of the settlement of a minor's claim, we have stated:

> Such a settlement is binding on behalf of the negotiators but *voidable* as to the minor pursuant to Rule 2039. Once the court approves the settlement negotiated by the parties, the agreement then becomes binding on the *minor*. This course of action allows the guardians of a minor to effectively negotiate a settlement while at the same time protect the minor's interest by requiring court ap-

---

4. The CAT Fund expressly authorized Attorney Sweeny to negotiate on its behalf at the settlement conference, and PPCIGA had previously authorized the CAT Fund to take the steps necessary to resolve this matter.

5. Counsel for Harrisburg Hospital negotiated separately with the Storms, and the Storms agreed to settle their claim against the Hospital for $ 5,000. Harrisburg Hospital tendered payment shortly thereafter.

proval before the settlement can have binding effect on the minor.... Normally, where a party enters into a settlement agreement, the agreement is binding and enforceable without court approval. Pa.R.C.P.2039 adds a requirement of court approval for the sole purpose of protecting the *minor's* rights. The agreement to settle in a minor's action comes into existence prior to the court's approval and it is only the court's disapproval of the terms of the agreement to settle that would permit a party to be released from its obligations thereunder.

*Dengler by Dengler v. Crisman*, 358 Pa.Super. 158, 516 A.2d 1231, 1233 (1986) (emphasis in original; citations omitted).

¶ 16 In other words, the purpose of the rule is not necessarily to resolve any dispute that may arise between those parties who negotiated the terms of the settlement.[6] As stated above, the settlement is enforceable against the "negotiators" without court approval. The Rule's primary purpose is to "prevent settlements which are unfair to minors, and to ensure that the minor receive the benefit of the money awarded." *Power by Power v. Tomarchio*, 701 A.2d 1371, 1374 (Pa.Super.1997). In considering whether to approve the settlement of a minor's claim, the court focuses on the best interests of the minor. *Id.*, at 1374.

¶ 17 At the time the petition was filed by the Storms, the applicability of PPCIGA's statutory setoff, although discussed pre-settlement by the parties, had apparently not become a matter of dispute as it relat-

ed to the settlement itself, and appellants had no reason to object to the Storms' petition which merely sought the court's approval of the settlement, i.e., a determination that the settlement was sufficient to provide for the minor's special needs. *See e.g., Shaw by Ingram v. Bradley*, 448 Pa.Super. 506, 672 A.2d 331 (1996).[7]

¶ 18 Clearly, it would have been better practice to wait to file the petition to approve the minor's settlement until the parties had at least attempted to reduce the agreement to writing, such that any dispute regarding the actual terms of the settlement would have manifested themselves, and the court could have resolved them at the proceeding to approve the settlement. *Compare, Klein v. Cissone*, 297 Pa.Super. 207, 443 A.2d 799 (1982) (record demonstrated that what was intended at hearing on settlement was a complete, final and enforceable agreement to settle the minor's tort claim, rather than an executory accord; therefore, minor and her parents were bound by the specifics of that settlement). However, we find no problem with the procedure employed presently, and we conclude the appellants did not waive their dispute over the application of PPCIGA's statutory right to a setoff by failing to object to the petition, since the terms of the settlement were apparently not in dispute at the time. The dispute over the application of PPCIGA's right to a setoff was proper matter to be resolved via the Storms' motion to compel settlement.

¶ 19 In a related argument, Dr. O'Malley submits that he, PPCIGA and

---

**6.** Of course, when there appears to be a dispute over the actual terms of the settlement, resolution of that dispute is properly before the court on a petition to approve a settlement. *Power by Power v. Tomarchio*, 701 A.2d 1371, 1374 (Pa.Super.1997) ("Thus, the courts were given the mandate to supervise

*all* aspects of settlements in which a minor is a party in interest.") (emphasis in original; citation omitted).

**7.** We note that Pa.R.C.P.2039 does not provide for exceptions to be filed to a petition to approve the settlement of a minor's claim.

the CAT Fund were denied procedural due process when the lower court granted the Storms' motion to approve the settlement of a minor pursuant to Pa.R.C.P.2039, without providing them with an opportunity to respond to the petition. We summarily reject Dr. O'Malley's procedural due process claim. While it may have been preferable practice to permit Dr. O'Malley to respond to the Storms' petition prior to entry of the order approving the settlement, all of the objections to the settlement which Dr. O'Malley, PPCIGA and the CAT Fund desired to present were heard and addressed at the hearing on the motion to compel settlement. Accordingly, Dr. O'Malley, PPCIGA and the CAT Fund suffered no prejudice from the lower court's actions.

¶ 20 We turn now to the question of whether the parties actually reached a valid and enforceable settlement agreement. The enforceability of settlement agreements is ordinarily determined by general principles of contract law. *Century Inn, Inc. v. Century Inn Realty, Inc.*, 358 Pa.Super. 53, 516 A.2d 765, 767 (1986).

> [T]here is a strong judicial policy in favor of voluntarily settling lawsuits. *Rothman v. Fillette*, 503 Pa. 259, 469 A.2d 543, 546 (1983) (citations omitted); *In re Trust of Mintz*, 444 Pa. 189, 282 A.2d 295, 299 (1971). The primary reason is that settlement expedites transference of money into the hands of a complainant. A secondary reason is that settlement reduces the burden on and expense of maintaining the courts. *Rothman, supra.*
>
> > Voluntary settlement of civil controversies is in high judicial favor. Judges and lawyers alike strive assiduously to promote amicable adjustments of matters in dispute, as for the most wholesome of reasons they cer-

tainly should. When the effort is successful, the parties avoid the expense and delay incidental to litigation of the issues; the court is spared the burdens of a trial and the preparation and proceedings that must forerun it.

*Autera v. Robinson*, 136 U.S.App.D.C. 216, 419 F.2d 1197, 1199 (1969).

Compromises may take the form of written agreements or oral settlements, both of which are recognized as valid and enforceable. 1 P.L.E. Accords and Compromise § 3 (1986).

> Of course, preliminary negotiations do not constitute a contract. "However, if the parties orally agree to all of the terms of a contract between them and mutually expect the imminent drafting of a written contract reflecting their previous understanding, the oral contract may be enforceable."

An oral settlement agreement may be enforceable and legally binding without a writing. "Where parties have reached an oral agreement, the fact that they intend to reduce the agreement to writing does not prevent enforcement of the oral agreement." *Kazanjian v. New England Petroleum Corp.*, 332 Pa.Super. 1, 480 A.2d 1153, 1157 (1984) (Citations omitted). As a corollary to the aforesaid:

> If the parties agree upon essential terms and intend them to be binding "a contract is formed even though they intend to adopt a formal document with additional terms at a later date." *The intent of the parties is a question of fact which must be determined by the factfinder. A reviewing court must defer to the findings of the trier of the facts if they are supported by the evidence.*

*Johnston v. Johnston*, 346 Pa.Super. 427, 499 A.2d 1074, 1076–77 (1985) (Citations omitted; emphasis added). *Accord*

*Woodbridge v. Hall,* 366 Pa. 46, 76 A.2d 205, 206 (1950) (Equity court had jurisdiction to enforce oral settlement agreement entered into by the parties; the findings of the chancellor were not disturbed on appeal because there was substantial evidence to support it).

*Sociedad Comercializadora v. Quizada,* 434 Pa.Super. 48, 641 A.2d 1193, 1197 (1993); *see also Compu Forms Control v. Altus Group,* 393 Pa.Super. 294, 574 A.2d 618, 623 (1990).

¶ 21 With the afore-stated law in mind, we turn to the parties' dispute regarding the enforceability of their settlement agreement. Initially, we are presented with the question of whether the parties agreed that the Storms would be paid a sum certain of $801,358. Related to that claim are the issues of whether PPCIGA it is entitled to the statutory offset of the $26,165 in related insurance (medical benefits) paid from other sources on behalf of the Storms, and if PPCIGA is entitled to the setoff, whether Dr. O'Malley is personally liable for the amount of PPCIGA's setoff or the CAT Fund is liable for the amount of the setoff.

¶ 22 We have reviewed the record before us, most importantly, the transcript of the hearing on the motion to compel settlement, and conclude that Dr. O'Malley, PPCIGA and the CAT Fund agreed to settle this case for a sum certain of $801,358, without regard to the source of those funds. Undoubtedly, the issue of PPCIGA's right to a statutory offset and Dr. O'Malley's personal liability for any settlement amount above that payable by PPCIGA and the CAT Fund were discussed prior to the pretrial conference at which the terms of the settlement were agreed upon. However, at that conference, there was no express mention of either issue. In addition, at that conference, there was no mention by any party

of an essential term which mandated sealing of the record. We find that the lower court's finding that the parties had agreed that the Storms' would receive a settlement of $801,358, without regard to PPCIGA's right to a setoff is supported by the record. *Woodbridge,* 76 A.2d at 206 (findings of the chancellor at a hearing on a petition to enforce a settlement will not be disturbed where they are supported by substantial evidence).

¶ 23 Simply put, the Storms believed that they would receive the full settlement amount of $801,358, and only after the Storms received court approval of the settlement did the appellant expressly indicate that PPCIGA's setoff and sealing of the record were essential terms of the agreement. The appellants cannot now seek to invalidate the agreement by asserting essential terms of the agreement after settlement negotiations were complete. *Cf., Kazanjian, supra* (oral settlement agreement was enforceable, despite party's claim that he did not intend to be bound to the agreement until a written instrument was signed by all parties, i.e., the party asserted that a written settlement agreement was an essential term of the settlement).

¶ 24 However, even though it is clear that the parties agreed to a settlement without regard to PPCIGA's right to a setoff, it does not necessarily follow that PPCIGA is prevented from asserting its *statutory right* to a setoff. Although we are convinced that the parties agreed that the Storms would receive the settlement amount of $801,358, we must decide from where or whom those funds are to come. PPCIGA asserts that it is only responsible for $173,835, which equals its statutory limit of $200,000, less the medical benefits already paid on the Storms' behalf of $26,165. The Storms counter that PPCIGA either waived or is estopped from as-

serting its statutory setoff since it did not expressly raise this claim at the time of the pretrial conference when settlement was reached.

¶ 25 When interpreting a statute, a court must attempt to ascertain the intent of the Legislature, which can only be derived by reading all sections of the statute together and in conjunction with each other and construed with reference to the entire statute. *Housing Auth. of County of Chester v. Pennsylvania State Civil Service Com'n,* 556 Pa. 621, 730 A.2d 935 (1999). The legislative intent behind the statute's enactment controls its meaning and application. *United Cerebral Palsy v. W.C.A.B.,* 543 Pa. 544, 673 A.2d 882 (1996).

¶ 26 At issue here is the applicability of the offset provision of the Act entitled "Non-duplication of recovery," which, as previously stated, provides:

Any person having a claim under an insurance policy shall be required to exhaust first his right under such policy. For purposes of this section, a claim under an insurance policy shall include a claim under any kind of insurance, whether it is a first-party or third-party claim, and shall include, without limitation, accident and health insurance, worker's compensation. Blue Cross and Blue Shield and all other coverages except for policies of an insolvent insurer. *Any amount payable on a covered claim under this act shall be reduced by the amount of any recovery under other insurance .*

40 P.S. § 991.1817(a) (emphasis added). A "covered claim" is defined, in pertinent part, at 40 P.S. § 991.1802 as:

(1) An unpaid claim, including one for unearned premiums, submitted by a claimant, which arises out of and is within the coverage and is subject to the applicable limits of an insurance policy

to which this article applies issued by an insurer if such insurer becomes an insolvent insurer after the effective date of this article and:

(i) the claimant or insured is a resident of this Commonwealth at the time of the insured event. . . .

¶ 27 There is no dispute that the $26,165 in medical benefits paid on behalf of the Storms was paid on a covered claim under the PPCIG Act. Accordingly, PPCIGA is entitled to a setoff of those amounts pursuant to 40 Pa.C.S.A. § 991.1817(a), absent being prevented from asserting that claim via waiver or estoppel as argued by the Storms.

¶ 28 We find that PPCIGA's right to its statutory setoff is nonwaivable, and PPCIGA is not estopped from asserting the claim. While there are no cases directly on point, our Supreme Court has indicated that statutorily mandated defenses are nonwaivable. For example, in *Tulewicz v. SEPTA,* 529 Pa. 588, 606 A.2d 427 (1992), our Supreme Court held that SEPTA was entitled to the statutory defense of immunity set forth in 42 Pa.C.S.A. § 5111 (repealed by Act of October 5, 1980, P.L. 693, No. 142). Our high court found the statutory defense was not waived even though SEPTA did not raise the issue until it filed its petition for reargument before our Supreme Court. In so ruling, it stated:

"The tax claim unit has raised their governmental immunity for the first time on appeal. They claim they are not only immune but that their immunity is not waivable, even if they negligently failed to do so before. Perhaps here is one reason their immunity cannot be waived; a governmental agency cannot be put at the mercy of negligent or agreed waiver by counsel of a substantive right designed to protect its very existence. Such negligence can spread,

pebble in a pond, until the governmental agency would be engulfed in a tidal wave of liability ... The defense of governmental immunity is an absolute defense, directly analogous to our holding in workmen's compensation cases and is not waivable ... nor is it subject to any procedural device that could render a governmental agency liable beyond the exceptions granted by the legislature." [Citations omitted.]

*Tulewicz*, 606 A.2d at 429, quoting *In re Upset Sale*, 522 Pa. 230, 232, 560 A.2d 1388, 1389 (1989) (taxing authority did not waive statutory defense of immunity by failing to raise it until its petition for allowance of appeal to Supreme Court).

¶ 29 Similarly, our Supreme Court has held that the exclusivity of the Workmen's Compensation Act for recovery by an employee for an injury suffered in the course of employment is not an affirmative defense which may be waived if not timely pleaded. *LeFlar v. Gulf Creek Indus. Park No. 2*, 511 Pa. 574, 580, 515 A.2d 875, 879 (1986). Also, our Commonwealth Court has held that the defense of governmental immunity, particularly the statutory limit on damages, is nonwaivable. *Dunaj v. Selective Ins. Co.*, 167 Pa.Cmwlth. 93, 647 A.2d 633, 635 (1994); *Mench v. Lower Saucon Township*, 159 Pa.Cmwlth. 116, 632 A.2d 1011, 1013 (1993), *appeals denied*, 538 Pa. 617, 645 A.2d 1320 (1994).

¶ 30 Presently, we are presented with an analogous situation to those afore-cited cases. PPCIGA simply seeks to assert the statutory limits of its liability. As indicated by the language of 40 Pa.C.S.A. § 991.1817(a), "Any amount payable on a covered claim under this act shall be reduced by the amount of any recovery under other insurance." Accordingly, the language of the statute expressly mandates the setoff, and we conclude that its failure to assert its right to setoff at the time of settlement is not an action which could render its liability beyond that granted by the Legislature.

¶ 31 In a related argument, the Storms argue that PPCIGA should be estopped from asserting the statutory right to a setoff in this situation because they did not expressly do so at the time of settlement. In *Chester Extended Care Center v. DPW*, 526 Pa. 350, 354, 586 A.2d 379, 382 (1991), our Supreme Court explained the doctrine of estoppel as follows:

The doctrine of estoppel is an equitable remedy that may be asserted against the government in this jurisdiction. *See, e.g., Commonwealth, Department of Public Welfare v. UEC, Inc.*, 483 Pa. 503, 397 A.2d 779 (1979); *see also Philadelphia v. Anderson*, 142 Pa. 357, 21 A. 976 (1891) (estoppel lies against city where city official responsible for certifying tax records on real property erred in certifying that subject property was unencumbered by unpaid taxes).... [T]he elements of estoppel are 1) misleading words, conduct, or silence by the party against whom the estoppel is asserted; 2) unambiguous proof of reasonable reliance upon the misrepresentation by the party asserting the estoppel; and 3) the lack of a duty to inquire on the party asserting the estoppel. 122 Pa. Cmwlth. 207, 214, 551 A.2d 1138, 1141–42, *citing, Commonwealth, Department of Public Welfare v. Town Court Nursing Center, Inc.*, 97 Pa.Cmwlth. 380, 509 A.2d 950 (1986), *allocatur denied*, 515 Pa. 595, 528 A.2d 603 (1987).

¶ 32 Assuming that the Storms were misled by PPCIGA's counsel's failure to assert expressly the right of statutory setoff at the time of settlement, we conclude that the Storms cannot establish that they reasonably relied on that omission or that they lacked a duty to inquire concerning the setoff at the time of settlement. Ac-

cordingly, PPCIGA cannot be estopped from asserting its right of setoff.

¶ 33 While the issue of PPCIGA's setoff was not specifically addressed at the pretrial conference when settlement was reached, it is clear that the issue was the subject of much discussion between the Storms' counsel and PPCIGA's counsel prior to that time. The transcript of the hearing on the motion to compel settlement and the record are replete with references to discussions, correspondence and pleadings concerning the statutory setoff. *See, e.g.,* Transcript of August 25, 27, 28, 1998, pp. 46, 58, 60, 93–94, 102–103. In fact, the Storms' counsel testified that they had researched the setoff issue prior to trial, questioned its validity and concluded, at worst, that the setoff was a "coverage" issue, related only to the question of from which source payment would come, i.e., Dr. O'Malley would be personally liable for any setoff. *See, e.g.,* Transcript of August 25, 27, 28, 1998, pp. 58–59, 102–103. In addition, counsel for Storms testified that he was aware of the statutory setoff but assumed that PPCIGA waived its right to setoff "simply because they never brought it up in settlement negotiations." Transcript of August 25, 27, 28, 1998, pp. 62–63, 95–96.

¶ 34 Simply put, the Storms were aware of PPCIGA's statutory right to a setoff but did not inquire about its application at the time of settlement. This is not the type of "reasonable reliance" which is necessary to warrant application of the doctrine of estoppel. This is evident when we compare the facts of this case to those where estoppel was permitted against a governmental agency. For example, in *Chester Extended Care Center, supra,* our Supreme Court permitted Chester Extended Care Center to argue successfully that the Department of Public Welfare was estopped from seeking repayment of funds that DPW paid to

the care center for the care of patients. In so ruling, our high court stated:

> Although it is the general rule that estoppel against the government will not lie where the acts of its agents are in violation of positive law, *Central Storage & Transfer Co. v. Kaplan,* 487 Pa. 485, 410 A.2d 292 (1979), this rule cannot be slavishly applied where doing so would result in a fundamental injustice. It would clearly be a fundamental injustice to hold appellant herein responsible for the cost of caring for its Medical Assistance patients. The agencies that administer the welfare programs in this Commonwealth have a duty to deal fairly and justly with those who assume the task of caring for our indigent citizens. Appellant relied in good faith upon the misleading conduct, silence and misrepresentations on the part of DOH and DPW in providing skilled nursing care to nearly one hundred Medical Assistance patients, who were sent to appellant *by DPW* for care, and appellant did everything possible to inquire into and to protect its status as a participant in the Medical Assistance program.

*Chester Extended Care Center,* 586 A.2d at 383.

¶ 35 Unlike Chester Extended Care Center which relied upon the express representations of DPW and other related governmental agencies in continuing to provide services to patients, the Storms did not rely upon the express representations of PPCIGA that it waived its setoff. Further, the Storms were aware of, at least, the possible application of PPCIGA's right to a setoff, and did not do "everything possible to inquire into and to protect" themselves. *Chester Extended Care Center,* 586 A.2d at 383. This matter could have been easily resolved at the time of settlement by the Storms simply asking whether PPCIGA's setoff applied and how

the setoff would affect the total amount of cash available for settlement.[8]

¶ 36 Moreover, estoppel against the government generally will not lie where the acts of its agents are in violation of positive law. *Central Storage & Transfer Co., supra.* Even assuming that counsel for PPCIGA affirmatively agreed to waive PPCIGA's right to a statutory setoff, we find that estoppel does not prevent PPCIGA from now asserting this limit on its liability. Counsel for PPCIGA had no authority to enter into such an agreement. *Cf., Central Storage,* 410 A.2d at 294 (where the Liquor Control Board was without statutory authority to enter into lease of warehouse, owners of warehouse which made modifications of the property to suit the Liquor Control Board on the basis of the Board's representations that it would lease the warehouse could not recover the costs of the alterations on a theory of promissory estoppel).[9]

¶ 37 Our decision regarding whether PPCIGA either has waived or is estopped from asserting its statutory right to a setoff after it has reached a settlement is also guided by the recent consolidated *en banc* cases of *Panea v. Isdaner,* Pa.Super. Dkt. No. 3677 Philadelphia 1998 (4/9/01), *Bell v. Slezak,* Pa.Super. Dkt. No. 2174 Pittsburgh 1998 (4/9/01), and *Baker v. Myers,* 2001 PA Super 108, 773 A.2d 782, Pa.Super. Dkt. No. 642 EDA 1999 (4/9/01). Those cases all have procedural postures similar to that presented herein.

¶ 38 In *Panea, supra,* the parties reached a settlement whereby the defendants agreed to pay $75,000, and executed a release discharging the defendants and their insurer, Physicians Insurance Company, from further liability. However, prior to payment, PIC was ordered into liquidation due to insolvency, and PPCIGA stepped in as successor to PIC. 40 Pa. C.S.A. § 991.1803. PPCIGA sought to offset its liability in the amount of $9,422 in health care benefits, which had been paid on the Paneas' behalf, and paid $65,578 to the Paneas. The Paneas sought to enforce the settlement and collect the entire $75,000. Upon review, we concluded that PPCIGA was entitled to the statutory offset and Dr. Isdaner was not personally responsible for the amount of the offset.

¶ 39 In *Bell, supra,* the parties, after court supervised settlement negotiations,

8. Given the fact that the CAT Fund's limit of liability at the time of this claim was $1,000,000, 40 Pa.C.S.A. § 1301.701(d) (amended 1996, Nov. 26, P.L. 776, No. 135, § 3, imd. effective), the parties clearly could have reached a settlement whereby PPCIGA's right to a setoff was preserved and the Storms' actual cash settlement from the current appellants remained $801,358. Of course, to reach such a result the parties would have needed to agree to a settlement figure of $827,523 ($801,358 + $26,165).

9. Further, we note that in those cases where the government has been estopped from denying the validity of a settlement, such as *Com., Dept. of Rev. v. King Crown,* 52 Pa. Cmwlth. 156, 415 A.2d 927 (1980) and *Com., Dept. of Trans. v. Limestone Prod. & Supply,* 72 Pa.Cmwlth. 360, 456 A.2d 706 (1983), which are cited by the Storms, are distinguishable from the present action. In those cases, the settlement reached by the parties was not in and of itself in violation of statute. Rather, in both of those cases, a settlement was reached which was not in violation of statute by a government attorney with "apparent authority" to settle the case. Only after the defendants agreed to the settlement were they informed that the government sought to repudiate the agreement on the grounds that its counsel did not have actual authority to settle. *See, King Crown, supra; Limestone Prod. & Supply, supra.* Presently, however, counsel for Dr. O'Malley, who had been authorized to settle on behalf of PPCIGA and the CAT Fund, lacked the *statutory* authority to waive PPCIGA's right to a setoff, and thus, the settlement itself was illegal to the extent that PPCIGA's statutory right to a setoff was allegedly waived.

reached a settlement wherein the Bells would receive the sum of $200,000 from defendant Dr. Slezak, which amount represented the limits of his PIC policy, and $300,000 from the CAT Fund, to the extent that the Cat Fund was liable on behalf of the defendants. A written agreement was executed, but prior to any payments to the Bells, PIC was declared insolvent, and PPCIGA assumed the position of primary insurer for Dr. Slezak and his professional corporation. PPCIGA refused to pay the $200,000, claiming that it was entitled to a statutory setoff of the entire amount under 40 Pa.C.S.A. § 991.1817(a), since medical benefits paid on behalf of the Bells exceeded $200,000. The Bells then filed a petition to enforce the settlement. Like our decision in *Panea, supra,* we held that PPCIGA was entitled to the setoff and Dr. Slezak was not personally liable for the amount of the setoff.

¶ 40 In *Baker, supra,* Robert Baker obtained a jury verdict in the amount of $47,500 against Dr. Donald Myers, and later, an additional $18,162.91 in delay damages was added to the verdict. Prior to trial, PPCIGA assumed Dr. Myers' defense since Dr. Myers' primary insurer, Physicians Insurance Company (PIC), became insolvent and was placed into liquidation. After the verdict, PPCIGA, for the first time in Dr. Myers' post trial motions, asserted its statutory right to a setoff. The trial court agreed that PPCIGA's obligation had to be reduced by the amount of workers' compensation benefits and medical costs which had been already been paid to or on behalf of Mr. Baker. Consequently, the verdict was molded to zero, as the amount of benefits already paid by other insurers exceeded the jury's verdict, plus delay damages. Mr. Baker appealed, and we affirmed.

¶ 41 In *Panea, supra,* and *Bell, supra,* the plaintiffs asserted that the setoff of the PPCIG Act should not be applied since it was not within the contemplation of the parties at the time of settlement, i.e., the defendants' insurer was not yet insolvent at the time of settlement, and to apply the setoff would amount to a reformation or rescission of their contracts without any showing of fraud, accident or mutual mistake. In rejecting that claim, we stated:

Reference to the Statutory Construction Act illustrates a statutory remedy is favored over the common law. Specifically, 1 Pa.C.S.A. § 1504 provides:

In all cases where a remedy is provided or a duty is enjoined or anything is directed to be done by any statute, the directions of the statute shall be strictly pursued, and no penalty shall be inflicted, or anything done agreeably to the common law, in such cases, further than shall be necessary for carrying such statute into effect.

The courts of this Commonwealth have consistently held that "[w]here a remedy is provided by an act of assembly, the directions of the legislation must be strictly pursued and such remedy is exclusive." *Lurie v. Republican Alliance,* 412 Pa. 61, 63, 192 A.2d 367, 369 (1963). *See also Harcourt v. General Accident Ins. Co.,* 419 Pa.Super. 155, 615 A.2d 71 (1992), *appeal denied,* 534 Pa. 648, 627 A.2d 179 (1993) (same). The instant Act provides a clear and adequate remedy for a loss due to the insolvency of a property and casualty insurer. Some of the Act's stated purposes are: "[t]o provide a means for the payment of covered claims under certain property and casualty insurance policies, to avoid excessive delay in the payment of such claims and **to avoid financial loss to claimants or policyholders** as a result of the insolvency of an insurer." 40 P.S. § 991.1801(1) (emphasis added).

The Act clearly attempts to protect both policyholders and those with claims against policyholders from the consequences of the insolvency of the insurer by establishing an association, the sole purpose of which is to compensate those who have claims which have not been paid because the insurance company is insolvent. The association is funded by assessing a fee against all member insurers, and every insurer is required to be a member as a condition of its authority to write property and casualty policies. 40 P.S. §§ 991.1803(a), (b)(3), and 991.1808. In this manner, the risk of loss due to the insolvency of any one insurer is spread out over all member insurance companies and their policyholders. *Id.* at § 991.1810. In effect, every time PPCIGA pays a claim, every member insurance company is paying part of the claim. The Act therefore seeks to lessen the financial burden on the insurance industry by preventing duplication of recovery. As Justice Zappala stated in reference to the prior version of the instant non-duplication provision: "This provision reflects the legislature's intent that fiscally solvent insurers, which are contractually obligated to pay a claim, be the primary source of payment." *Bethea v. Forbes,* 519 Pa. 422, 428, 548 A.2d 1215, 1218 (1988). Given the legislative intent of this statutory scheme, we find the plaintiffs' entitlement to the disbursement of settlement funds is not controlled by common law contract principles. Rather, to the extent there was insurance coverage, the right to payment constitutes nothing more than a claim against an insolvent insurer by virtue of having a claim against a tortfeasor who was insured by that insurer. Furthermore, a plaintiff who has a claim under the defendants' insurance policy, which remains unpaid at the time of insolvency, is considered as having a "covered claim" under § 991.1802 (defining covered claim), and thus falls within the parameters of § 991.1817 (Non-duplication of recovery).

*Panea,* 2001 PA Super 108, ¶¶ 12–13, 773 A.2d 782.

¶ 42 We are convinced that our holding in *Panea, supra,* supports our conclusion that PPCIGA's statutory right to an offset is nonwaivable and PPCIGA should not be estopped from asserting the setoff, since PPCIGA's counsel's failure to assert affirmatively the setoff was in violation of the PPCIG Act, which mandates the setoff. *Cf., Central Storage & Transfer Co.,* 410 A.2d at 294 (the Commonwealth or its subdivisions and instrumentalities cannot be estopped by the acts of its agents if those acts are outside the agent's powers, in violation of positive law, or acts which require legislative or executive action).

¶ 43 We recognize the factual distinction between the present case, where PPCIGA was actually involved in the settlement negotiations, and *Panea, supra,* and *Bell, supra,* where PPCIGA did not assume PIC's place as insurer until after a settlement had been reached. Thus, it is certainly arguable that PPCIGA bears a culpability for failing to assert its right of setoff in this case that was not present in those cases. However, in both those cases and the present case, the plaintiffs' arguments against application of PPCIGA's right to a setoff are similar, that being PPCIGA's right to a setoff was not within the contemplation of the parties at the time of settlement. Our resolution of the issue in all of these cases in favor of PPCIGA's right to assert its setoff is grounded upon the statutory scheme which our Legislature has enacted to ensure insurance coverage when a insurer becomes insolvent, rather than common law contract principles.

¶ 44 Similarly, we acknowledge that the facts of *Baker, supra,* also differ from those currently before us. In *Baker, supra,* PPCIGA did not attempt to assert its right to a setoff until after the jury had rendered a verdict. In finding that PPCIGA was entitled to assert its right to a setoff after a jury verdict, we stated:

> Once a verdict is returned finding liability and establishing damages, the defendants and PPCIGA at that point, provided the Act has been triggered by the insurer's insolvency, are certainly aware that application of the offset provision would affect the amount of the verdict. Accordingly, we find the timely filing of post-trial motions asserting the statutory offset is an appropriate method to assure that the trial court still has jurisdiction to act.[8]

8. This, of course, is not to suggest that PPCIGA would be precluded from asserting its entitlement to the offset after the judgment is final. Rather, since the offset operates to partially or completely satisfy PPCIGA's obligation, it may be raised at any time from verdict to execution on the judgment.

*Panea,* 2001 PA Super 108, ¶ 22, 773 A.2d 782.

¶ 45 Just as it was appropriate for PPCIGA to assert its statutory right of a setoff after the jury's verdict, i.e., it was not waived, we conclude that PPCIGA did not waive its right to a setoff simply by waiting until after the settlement amount was decided to assert it.

 ¶ 46 Given that we have determined that PPCIGA neither waived nor was estopped from asserting its statutory right to a setoff of medical benefits paid on behalf of the Storms, we must next determine whether, as suggested by the Storms, Dr. O'Malley is personally liable for the amount of the setoff. This question was squarely addressed in the *Panea, supra,* wherein we stated:

We are next presented with the question of whether in light of the application of § 991.1817(a) the insured of the insolvent insurer may be held personally responsible for the amounts offset. We find the legislative intent of the Act precludes such an anomalous result. The plaintiffs argue that if the insureds are not personally liable then the plaintiffs will bear the loss, and as between an innocent victim and a tortfeasor the risk of loss should be placed on the tortfeasor. Despite the facial appeal of the argument, a closer examination of how the Act serves to spread the loss belies the plaintiffs' contention. In fact it is not the plaintiffs who bear the loss, rather, if any loss can be said to have occurred, it is the solvent insurers who paid plaintiffs' claims under the other sources of insurance, which the Act requires to be exhausted first. In each of the three cases under consideration the plaintiffs will receive the full amount of either their settlements or jury verdict, it just will not necessarily come from PPCIGA or the doctors.

For example in the case of the Paneas, the settlement amount was $75,000.00. PPCIGA offset $9,422.00, which was paid by the Paneas' health insurance carrier and paid the Paneas the balance of $65,578.00. The health insurance carrier cannot assert a subrogation claim against the Paneas for the $9,422.00 because by application of the Act's non-duplication of recovery provision the Paneas never received that sum under the settlement. As subrogee, the Paneas' health insurance carrier has no greater rights than those held by the Paneas. *See Allstate Ins. Co. v. Clarke,* 364 Pa.Super. 196, 527 A.2d 1021, 1024 (1987) (stating "as subrogee stands in the precise position of the subrogor the subrogee should be limited to recovering in subrogation the amount received by

the subrogor *relative* to the claim paid by the subrogee. . . ."). It is well established that subrogation is an equitable doctrine involving the right of legal substitution and may take place with or without contractual agreement between the parties. *Kaiser v. Old Republic Ins. Co.*, 741 A.2d 748, 754 (Pa.Super.1999). "It is granted as a means of placing the ultimate burden of a debt upon the one who in good conscience ought to pay it, and is generally applicable when one pays out of his own funds a debt or obligation that is primarily payable from the funds of another." *Id.* (citations omitted). Since the Paneas are precluded from recovering by application of the non-duplication of recovery provision, they have not recovered relative to the claim paid by the subrogee; therefore, the health insurer cannot recover from the Paneas.

Nor can the health insurance carrier recover that sum from PPCIGA because such a claim does not constitute a covered claim pursuant to the Act. *See* 40 P.S. § 991.1802, (definition of "covered claim"), at (2) (stating: "The term shall not include any amount . . . due any reinsurer, insurer, insurance pool or underwriting association as subrogation recoveries or otherwise."), *see also, American States Ins. Co. v. State Auto Ins. Co.*, 721 A.2d 56, 62 (Pa.Super.1998) (interpreting the similarly worded definition of the predecessor statute, 40 P.S. § 1701.103(5)(b), as prohibiting a claim of an insurer against PIGA for equitable subrogation). Any other result would subvert the intention of the non-duplication of recovery provision of § 991.1817(a). Contrast this scenario with what would have occurred if PIC had remained solvent. The Paneas would have received the entire $75,000.00 from PIC; however, this recovery would have been subject to the health insurer's subrogation rights re-

ducing their recovery to $65,578.00. Consequently, by application of the Act the Paneas are in the same position they would have been in had there been no insolvency. This same scenario holds true for the Bells and Mr. Baker. To find the doctors personally liable for the offset amount would contravene one of the stated purposes of the Act, which is "to avoid financial loss to . . . policyholders as a result of the insolvency of an insurer." 40 P.S. § 991.1801(1).

*Panea*, 2001 PA Super 108, ¶¶ 15–17, 773 A.2d 782.

¶ 47 As previously stated, the Storms' claim that if their cash settlement amount of $801,358, is reduced by the statutory setoff, then the terms of their settlement agreement would be violated. However, just as in *Panea, supra*, this argument ignores the fact the Storms actually will receive the full amount of their settlement. The Storms have already received $26,165 in medical benefits, and PPCIGA and the CAT Fund will remit the balance of the settlement amount. Just as with the Paneas, since the Storms are precluded from recovering the $26,165 in medical benefits from PPCIGA, they will not recover relative to a claim paid by a subrogee, and their health care provider cannot recover that sum from their settlement. If we were to permit the Storms to recover this amount from PPCIGA, the CAT Fund or Dr. O'Malley personally, the Storms' medical insurer would be entitled to recover that amount from them. In the end, the net recovery by the Storms is the same whether PPCIGA is entitled to its setoff or whether the Storms' health care insurer, as subrogee, is entitled to recover the payments it made from the Storms' settlement.

¶ 48 The facts of the present case do differ from those of *Panea, supra*, in one significant respect, that being the settlement agreed upon exceeds that of PPCI-

GA's limits of liability. In other words, it is arguable that an insured could be held personally liable for the amount exceeding the policy limits or statutory limit of liability. However, in the present case, although the limits of PPCIGA's liability were exceeded, the limits of all "insurers" were not since the CAT Fund's limit of liability was $1,000,000 at the time of settlement.[10] Thus, we need not consider the question of a defendant's personal liability for settlement sums in excess of policy limits. *Cf., Panea*, 2001 PA Super 108, ¶ 19, 773 A.2d 782.[11]

■■■ ¶ 49 Having determined that PPCIGA is entitled to enforce its statutory right to setoff those medical benefits paid on behalf of the Storms and that Dr. O'Malley is not personally responsible for the amount of the setoff, we must now determine whether the CAT Fund is required to "drop down" and cover the amount of the setoff so that the net cash settlement amount totals $801,358. The Cat Fund is statutorily liable to pay:

> ... all awards for loss or damages against a health care provider as a consequence of any professional liability action brought under this act **to the extent any health care provider's share exceeds his basic insurance coverage.**

40 P.S. § 1301.701(d) (amended 1996, Nov. 26, P.L. 776, No. 135, § 3, imd. effective) (emphasis added).

¶ 50 The CAT Fund argues that it is responsible for only those sums above PPCIGA's liability limit of $200,000, and is neither required nor permitted to "drop down" and cover those sums which are

statutorily offset from PPCIGA's liability. It is clear that the CAT Fund provides only excess coverage. In other words, it is liable to pay claims only when the health care provider's liability exceeds its basic coverage. *Pennsylvania Osteopathic Medical Ass'n v. Foster*, 134 Pa.Cmwlth. 368, 579 A.2d 989 (1990), *affirmed*, 530 Pa. 198, 607 A.2d 1073 (1992). Presently, Dr. O'Malley's basic coverage of $200,000 provided by PPCIGA was exceeded by the settlement amount, and we are convinced that CAT Fund is liable, by statute, only for that amount of the settlement in excess of PPCIGA's $200,000 limit of liability. To require the CAT Fund to cover the amount of PPCIGA's setoff would, in effect, require the CAT Fund to pay for claims below the limits of the health care provider's basic insurance coverage. This would violate the express terms of the Health Care Service Malpractice Act. 40 Pa.C.S.A. § 1301.701(d).

¶ 51 Of course, the same waiver argument and estoppel argument could be made against the CAT Fund as they were against PPCIGA. However, we reject such arguments for the same reasons that we rejected them with regards to PPCIGA. The CAT Fund's limits of liability, or more particularly in this case, its threshold of liability, is not waivable. Further, like PPCIGA's actions, the CAT Fund's actions were not such that it should be estopped from asserting its threshold of liability.

■■■ ¶ 52 At this point, we have determined that PPCIGA neither waived its statutory setoff nor was estopped from asserting it. We have also determined

---

**10.** As indicated in footnote 5, *supra*, sufficient funds remained available from the CAT Fund to settle this case in a manner which permitted the Storms to enjoy a net settlement of $801,358, from the present appellants.

**11.** We note that although not specifically addressed in *Paneas'* companion case of *Bell, supra*, the Bells' settlement exceeded PPCI-

GA's liability limit, but did not exceed the limit of the CAT Fund. Consequently, like the Storms, the Bells' settlement amount did not exceed the total limits of liability of all insurers, and according to the analysis employed today, the Bells would not have been entitled to recover PPCIGA's setoff from their physician-defendant.

that Dr. O'Malley is not personally liable for the amount of the setoff. In addition, we are convinced that the CAT Fund did not waive its right to assert its threshold of liability and cannot now be estopped from asserting it. Accordingly, we now turn to the CAT Fund's claim that there can be no settlement unless the Storms execute the general release containing the confidentiality clause which was provided by the CAT Fund. In a related argument, Dr. O'Malley claims that the lower court erred in refusing to seal the record in this case, since all parties agreed that sealing of the record was appropriate.

¶ 53 With regard to the CAT Fund's claim that there can be no settlement until the Storms execute the general release provided to them, we conclude that execution of the specific general release with the confidentiality clause proffered by the CAT Fund was never an essential term of the settlement agreement. As we previously stated, an oral settlement agreement is enforceable where the parties have agreed to all essential terms of the agreement and intend the agreement to be binding, even though the parties may not be able to agree to the terms of the written settlement agreement. *Woodbridge, supra; Compu Forms Control, supra; Kazanjian, supra* ("The tender of a release did not reopen the agreement or make its execution a condition of the settlement itself.") Thus, the parties' settlement is not voided simply because the Storms did not execute a release with the precise language proffered by the CAT Fund.

¶ 54 Further, the lower court determined that a confidentiality clause was never discussed during settlement negotiations, and our review of the record reveals no evidence that settlement was ever conditioned upon the sealing of the record. Accordingly, the settlement is not void due the Storms' failure to agree to the confidentiality clause.[12]

¶ 55 Turning to Dr. O'Malley's related claim that the lower court erred in denying the parties' motion to seal the record, we find that the lower court did not abuse its discretion. In *Hutchison v. Luddy*, 398 Pa.Super. 505, 581 A.2d 578, 582 (1990), *rev'd on other grounds*, 527 Pa. 525, 594 A.2d 307 (1991), we stated:

> The party who seeks closure bears the burden of establishing that closure is appropriate under the circumstances. *Katz v. Katz*, 356 Pa.Super. 461, 466, 514 A.2d 1374, 1379 (1986). A trial court's decision to grant or to deny closure will be reviewed on appeal only to determine if the trial court abused its discretion. *Publicker Industries, Inc. v. Cohen*, 733 F.2d 1059, 1071 (3d Cir.1984).

> In Pennsylvania, the common law, the first amendment to the United States Constitution, and the Pennsylvania Constitution, all support the principle of openness. "All courts shall be open." Pa. Const. Art. I, § 11. *See Commonwealth v. Fenstermaker*, 515 Pa. 501, 504, 530 A.2d 414, 417 (1987) (*quoting Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573, 100 S.Ct. 2814, 2825,

---

**12.** We note that the CAT Fund's claim also fails because at the hearing on the motion to compel settlement, the Storms, although originally taking no position on sealing of the record, eventually joined in Dr. O'Malley's and the CAT Fund's request to seal the record.

Further, we agree with the lower court's conclusion that a confidentiality clause could never be an essential term of an agreement to settle a **minor's** claim, since settlement of a minor's claim requires court approval pursuant to Pa.R.C.P.2039, and court proceedings are a matter of public record. Thus, sealing of the record in the case of a minor's settlement is not a *pro forma* matter that is automatically performed upon the agreement of the parties, but rather, is permitted only upon analysis and approval by the court.

65 L.Ed.2d 973 (1980)). More than one basis for the public right of access to civil trials has been articulated. *See Publicker, supra.* Nonetheless, the presumption of public access is rebuttable. *Bank of America Nat'l Trust and Sav. Ass'n v. Hotel Rittenhouse Associates,* 800 F.2d 339, 344 (3d Cir.1986).

Two methods have emerged in the Third Circuit by which one may attempt to overcome the presumption of openness and to limit public access. First, if attempting to achieve closure under a first amendment analysis, "there must be a showing that the denial serves an important governmental interest and there is no less restrictive way to serve that governmental interest." *Publicker,* 733 F.2d at 1070 (*citing Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 606–07, 102 S.Ct. 2613, 2619–20, 73 L.Ed.2d 248 (1982)). Also, it must be established "that the material is the kind of information that courts will protect and that there is good cause for the order to issue." *Publicker,* 733 F.2d at 1071. "Good cause is established on a showing that disclosure will work a clearly defined and serious injury to the party seeking closure." *Id.*

Second, a party who attempts to establish that the common law presumption in favor of access does not extend to certain records or proceedings must show that "the interest in secrecy outweighs the presumption." *Bank of America,* 800 F.2d at 344. In deciding whether to grant the motion of the party who seeks to seal records or proceedings under the *common* law approach, the court engages in a balancing test, weighing on the one hand the factors in favor of access, and, on the other, those against it. *Id.* (*citing United States v. Criden,* 648 F.2d 814, 818 (3d Cir.1981)).

¶ 56 Dr. O'Malley argues that after applying the balancing test of *Bank of America, supra,* the lower court erred in

denying his motion to seal the record. Specifically, he suggests:

> Here, it is in the interest of the child that she be both physically and emotionally protected from outside influences during the course of her development. She should be free from solicitations from vendors of medical products, educational products, annuity products and those who might wish to purchase her structured settlement for a portion of its worth. On the other hand, there was no significant issue of public interest or grave public concern demonstrated. On the contrary, there was no criminal conduct by O'Malley involved nor was there any concern or evidence that this was a pattern of conduct by O'Malley which should be brought to the public's attention. No public interest would have been served by making the settlement public, but much damage could have been done to the minor in this case as well as to Dr. O'Malley, his reputation and his position in the community. Furthermore, the sealing of the record in this case is in keeping with the court's general policy to encourage the settlement of medical malpractice cases. If defendants involved with a cause of action against a minor are made aware of the fact that it is unlikely that they are going to be able to keep the settlement private, they will be more inclined to take their chances with a trial. Settlement will no longer be as attractive because there will be no guarantee that adverse publicity can be avoided.

Dr. O'Malley's Brief, p. 21.

¶ 57 The lower court rejected this argument in favor of sealing the record. The court concluded that the minor's interest in secrecy was not significant in light of the fact that she and her family no longer reside in the area. Further, the court indicated that Dr. O'Malley's general arguments that there was no public interest in leaving the record open and that the seal-

ing of the record would encourage settlement did not outweigh the public's interest in open court proceedings. Further, the court decided that the defendants failed to establish that they would suffer a "serious injury," absent sealing of the record. *See* Trial Court Opinion, p. 10. We agree with the lower court's reasoning and find that the court did not abuse its discretion in refusing to seal the record.

¶ 58 In conclusion, we find, as did the lower court, that the parties entered into a valid and enforceable settlement agreement. However, we find that the lower court erred when it held that either PPCIGA or the CAT Fund was responsible to pay that amount for which PPCIGA was entitled to a statutory setoff. Rather, we find that PPCIGA is entitled to reduce its obligation by its statutory setoff, and the CAT Fund cannot be compelled to make up for that amount by essentially dropping below its threshold of liability. In addition, we conclude that Dr. O'Malley may not be held personally liable for the amount of the setoff. In so ruling, we are cognizant of the importance of the statutory scheme which our Legislature enacted to protect innocent tort victims and insureds from the unpleasant ramifications of insolvent insurers. Despite the Storms' protestations to the contrary, they have recovered the full amount of their agreed-upon settlement. Were we to direct PPCIGA or the CAT Fund to pay the settlement without regard to PPCIGA's statutory setoff, the Storms' ultimate recovery would not change as their health care insurer, as subrogee, would be entitled to recover a like sum from them. Finally, we find that the CAT Fund's proposed confidentiality clause was not a part

of the parties' settlement agreement, and that the lower court did not err in denying Dr. O'Malley's motion to seal the record.[13]

¶ 59 Accordingly, we affirm the order compelling settlement in the amount of $806,358. We vacate the order to the extent that it requires either PPCIGA or the CAT Fund to remit an amount equal to the $26,165 in medical benefits already paid on behalf of the Storms for which PPCIGA is entitled to a setoff. We also affirm the order to the extent that it found that any provision for confidentiality was not part of the settlement agreement and denied Dr. O'Malley's motion to seal the record.

¶ 60 Order affirmed in part and vacated in part. Jurisdiction relinquished.

---

**13.** We note that while it is arguable that the application of the statutory setoff after the parties have negotiated a settlement during which the setoff was not discussed could be grounds to rescind the settlement, the Storms have not sought to rescind the agreement in the event that we find that PPCIGA is entitled to its setoff and neither the CAT Fund nor Dr. O'Malley is responsible to make up that amount. *Cf., Panea,* 2001 PA Super 108, ¶ 11 n. 3, 773 A.2d 782.