Alessa ELLIOTT–REESE, Petitioner,

v.

MEDICAL PROFESSIONAL LIABILITY CATASTROPHE Loss Fund and Pennsylvania Property & Casualty Insurance Guaranty Association, Respondents.

Commonwealth Court of Pennsylvania.

Argued March 11, 2002.

Decided May 31, 2002.

Publication Ordered Sept. 5, 2002.

---

Keith S. Erbstein, Philadelphia, for petitioner.

Lise Luborsky, Philadelphia, for respondent, The PA Property & Casualty Insurance Guaranty Association.

Tawny K. Mummah, Harrisburg, for respondent, Medical Professional Liability Catastrophe Loss Fund.

BEFORE: COLINS, President Judge, COHN, Judge, and McCLOSKEY, Senior Judge.

OPINION BY President Judge COLINS.

Before this Court in its original jurisdiction are cross-motions for summary relief filed respectively by Alessa Elliott–Reese (Petitioner), the Pennsylvania Medical Professional Liability Catastrophe Loss Fund (CAT Fund),[1] and the Pennsylvania Property & Casualty Insurance Guaranty Association (Guaranty Association).[2]

The following factual and procedural developments preceded the summary judgment motions. In 1992, Petitioner instituted a medical malpractice action in the

---

**1.** The CAT Fund, established by the Health Care Services Malpractice Act, Act of October 15, 1975, P.L. 390, *as amended,* 40 P.S. §§ 1301.101–1301.1006 (Malpractice Act), is a statutory excess carrier providing additional excess medical malpractice insurance coverage to the extent that a health care provider's liability exceeds its basic coverage insurance in effect at the time of an occurrence. *Storms v. O'Malley,* 779 A.2d 548, 553–54 n. 1 (Pa.Super.2001).

**2.** The Guaranty Association was created by the Act of December 12, 1994, P.L. 1005, 40 P.S. §§ 991.1801–991.1820 (Guaranty Act), to provide a means of paying covered claims under certain property and casualty insurance policies, to avoid excessive delay in the payment of such claims, and to prevent claimants or policyholders from incurring financial loss as a result of an insurer's insolvency. *Storms,* 779 A.2d at 554 n. 2 (Pa.Super.2001).

Philadelphia Court of Common Pleas (Trial Court) against Joel Lebed, D.O., Jay Sivitz, M.D., and Tri–County Ob/Gyn. Ltd. (collectively physicians). On March 29, 1999, a jury returned a verdict for Petitioner of $750,000.00 after finding Dr. Lebed 60% responsible and Dr. Sivitz 40% responsible. On August 31, 1999, the Trial Court molded the verdict to include delay damages of $374,029.10 for a total verdict of $1,124,029.10. The physicians appealed to the Superior Court of Pennsylvania, which affirmed the Trial Court's molded verdict, and subsequently, the Pennsylvania Supreme Court denied allocatur.

In December of 2000, the Guaranty Association paid Petitioner $225,523.70, an amount representing its coverage of $300,000, less an offset of $74,476.30 for medical expenses that Petitioner received from her own insurance carrier. On June 11, 2001, the Guaranty Association paid Petitioner an additional $100,000.00, for a total cash payment, less offset, of $325,523.70.

On or about June 6, 2001, in this Court's original jurisdiction, Petitioner filed a petition in the nature of a complaint in mandamus, brought against the CAT Fund and against the Guaranty Association. Said petition seeks payment of the delay damages, pursuant to Pa. R.C.P. No. 238, and post-judgment interest, pursuant to 42 Pa. C.S. § 8101, statutorily attributable[3] to the basic coverage insurance carrier, as well as reimbursement from either the CAT Fund or the Guaranty Association for the costs incurred by Petitioner in litigating the underlying malpractice action. The petition alleges that PIC Insurance Group, Inc. (PIC), the primary insurance carrier for the physicians named in Petitioner's malpractice action, was to provide each physician with basic coverage insurance of $200,000.00. In addition, the petition alleges that since January 1998 when PIC was placed into liquidation, the Guaranty Association, as successor to PIC, had a statutory responsibility for the administration and defense of PIC claims. Petitioner avers, therefore, that since the Guaranty Association is PIC's successor, it is obligated to assume the indemnity and cost of defense for said physicians.

Petitioner avers that the CAT Fund agreed to pay her $610,525.00 on December 31, 2001, which amount represents the CAT Fund's $350,000.00 share (approximately 46%) of the verdict plus the CAT Fund's statutory proportionate share (approximately 46%) of the delay damages and the post-judgment interest on that amount. Petitioner argues that the CAT Fund cannot take advantage of Section 702(j)[4] of the Malpractice Act to limit the

---

**3.** Reference is made specifically to Section 701 of the Malpractice Act, 40 P.S. § 1301.701(a), providing that each hospital in Pennsylvania and each physician with at least 50% of his practice in Pennsylvania must either buy $200,000.00 in basic or primary coverage insurance or establish self-insurance in that amount. Section 701 also created the CAT Fund, for the purpose of paying all awards, judgments, and settlements for loss or damages against health care providers entitled to participate in the Fund, to the extent the health care provider's share of liability exceeds its basic coverage insurance in effect at the time of the occurrence or loss. 40 P.S. § 1301.701(d). On November 26, 1996, Act 135, the Act of November 26, 1996, P.L. 776,

No. 135, 40 P.S. §§ 1301.101—1301.1004 (Act 135), was signed into law, amending the Malpractice Act. Pursuant to Act 135, the amounts of basic coverage insurance and Fund coverage vary; however, in the present underlying medical malpractice claim resolved by way of verdict on March 29, 1999 the amount of basic coverage insurance applicable is $200,000.00 for each defendant physician.

**4.** Section 702(j), 40 P.S. § 1301.702(j), provides:

Delay damages and postjudgment interest applicable to the fund's liability in a case shall be paid by the fund and shall not be charged against the insured's annual aggre-

amount of delay damages and post-judgment interest it is required to pay when, as in the present case of PIC's insolvency, a basic carrier does not exist, or if, as the Guaranty Association contends, the substitute guarantee fund is not required to pay any of the delay damages and post-judgment interest. In this regard, Petitioner argues that Section 702(j) is directed to an insurer that pays its statutory coverage, whereas in this case, there is essentially no insurer. Petitioner also contends that the CAT Fund cannot pro rate its payment of delay damages and post-judgment interest unless this Court finds the Guaranty Association responsible for paying a pro rata share of the delay damages and post-judgment interest. It is Petitioner's position, however, that even if the CAT Fund were permitted to pro rate, its appropriate pro rata share of the delay damages and post-judgment interest is 80%, or $811,651.89, not $610,525.00.

Petitioner also maintains that pursuant to the Guaranty Act establishing the Guaranty Association, delay damages, post-judgment interest and costs are covered claims, and since Tri–County Ob/Gyn, Ltd. is a separately insured entity from the two insured physicians named in the underlying malpractice action, the Guaranty Association's proper coverage responsibility is in the amount of $600,000.00 rather than $400,000.00. In the event, avers Petitioner, that the Guaranty Association succeeds in avoiding responsibility for delay damages or post-judgment interest, the CAT Fund must then pay Petitioner these sums.

 The CAT Fund and the Guaranty Association, respectively, in addition to opposing Petitioner's application for summary relief, have each filed motions for summary relief. The CAT Fund avers that as a result of its payments and those of the Guaranty Association, Petitioner will have received a total of $936,048.70, which amount represents full satisfaction of the $750,000.00 verdict, less the Guaranty Association's offset of $74,476.30 for medical benefits received by Petitioner, plus the CAT Fund's proportionate share of delay damages and post-judgment interest on the verdict. The CAT Fund maintains that, pursuant to the Malpractice Act, it fully satisfied its statutory obligation by its $610,525.00 payment of December 31, 2001 to Petitioner, which amount represents its appropriate share of the liability, $350,000.00, plus its proportionate share of delay damages and post-judgment interest. It is the CAT Fund's position that Section 702(j) of the Malpractice Act expressly provides that its payment of delay damages and post-judgment interest is limited to its proportionate share of the CAT Fund's liability, and does not include responsibility for any balance of outstanding delay damages and post-judgment interest attributable to the basic coverage insurance carrier. The CAT Fund also contends that pursuant to the Malpractice Act and recent appellate case law, it is prohibited from paying the Guaranty Association's offset, which is an obligation also within the limits of the basic coverage insurance carrier. Similarly, the CAT Fund maintains that pursuant to Act 135, the delay damages and post-judgment interest on the basic coverage insurance carrier's liability, like the offset, are not the Fund's statutory responsibility.

 The Guaranty Association argues that its obligation is limited to the policy limit of PIC, the insolvent insurer, subject to the offset, and that the amount of interest cannot exceed that limit unless there is a judgment against the Association itself. The Guaranty Association further avers

gate limits. The basic insurance carrier or self-insurer shall be responsible for its proportionate share of delay damages and post-judgment interest.

that it has satisfied the entire amount of its obligation by paying $400,000.00 minus the offset, and that once the CAT Fund paid $350,000.00, plus its proportionate part of delay damages and interest on December 31, 2001, the only remaining amount at issue in Petitioner's case is the balance of delay damages and post-judgment interest not payable by the Association. That amount, avers the Guaranty Association, may be recovered, if at all, solely through PIC liquidation proceedings.

In considering the parties' respective applications, this Court notes that summary judgment may be granted only in those cases where the record clearly shows that there exist no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Marks v. Tasman*, 527 Pa. 132, 589 A.2d 205 (1991). On a motion for summary judgment, the record must be viewed in a light most favorable to the opposing party, and all doubts as to the existence of a genuine issue of material fact must be resolved in favor of the non-moving party. *Kapres v. Heller*, 536·Pa. 551, 640 A.2d 888 (1994). Applying the foregoing guidelines to the matter before us, we conclude that the Respondents have successfully established that no genuine issues of material fact exist in this matter and that they are entitled to judgment as a matter of law.

Analogous issues to those raised by the present Petitioner when an insurer becomes insolvent were discussed in *Storms*, 779 A.2d at 563, 567 (citations omitted and emphasis added). Therein our Superior Court reaffirmed,

> The courts of this Commonwealth have consistently held that "[w]here a remedy is provided by an act of assembly, the directions of the legislation must be strictly pursued and such remedy is exclusive." The instant Act [Guaranty Act] provides a clear and adequate remedy for a loss due to the insolvency of a property and casualty insurer. Some of the Act's stated purposes are: "[t]o provide a means for the payment of covered claims under certain property and casualty insurance policies, to avoid excessive delay in the payment of such claims and to avoid financial loss to claimants or policyholders as a result of the insolvency of an insurer." 40 P.S. § 991.1801(1) . . .

. . . .

Having determined that PPCIGA is entitled to enforce its statutory right to setoff those medical benefits paid on behalf of the Storms and that Dr. O'Malley is not personally responsible for the amount of the setoff, we must now determine whether the CAT Fund is required to "drop down" and cover the amount of the setoff so that the net cash settlement amount totals $801,358. The CAT Fund is statutorily liable to pay:

> . . . all awards for loss or damages against a health care provider as a consequence of any professional liability action brought under this act to the extent any health care provider's share exceeds his basic insurance coverage.

40 P.S. § 1301.701(d)(amended 1996, No. 26, P.L. 776, No. 135, § 3, imd. effective).

The CAT Fund argues that it is responsible for only those sums above PPCIGA's liability limit of $200,000, and is neither required nor permitted to "drop down" and cover those sums which are statutorily offset from PPCIGA's liability. *It is clear that the CAT Fund provides only excess coverage. In other words, it is liable to pay claims only when the health care provider's liability exceeds its basic coverage.* Presently, Dr. O'Malley's basic coverage

of $200,000 provided by PPCIGA was exceeded by the settlement amount, and we are convinced that [the] CAT Fund is liable, by statute, only for that amount of the settlement in excess of PPCIGA's $200,000 limit of liability. To require the CAT Fund to cover the amount of PPCIGA's setoff would, in effect require the CAT Fund to pay for claims below the limits of the health care provider's basic insurance coverage. This would violate the express terms of the Health Care Service Malpractice Act, 40 Pa. C.S.A. § 1301.701(d).

The foregoing determinations set forth in *Storms* are applicable to the present matter and are consistent with the CAT Fund's assumption of responsibility for only its proportionate share of delay damages and post-judgment interest as they relate to excess coverage. Additionally, the result in *Storms* is consistent with the CAT Fund's position that it is not required to assume responsibility for the amount that the Guaranty Association is entitled to offset. Similarly, the *Storms* court reaffirmed the unwaivable, statutory right of an insolvent insurer's successor, in the present case the Guaranty Association, to offset its obligations by the amount of benefits, including payment of medical costs already received by petitioners, and stated:

> Our resolution of the issue in all of these cases in favor of PPCIGA's [successor to an insolvent insurer] right to assert its setoff is grounded upon the statutory scheme which our Legislature has enacted to ensure insurance coverage when a insurer becomes insolvent, rather than common law contract principles.

*Id.*, 779 A.2d at 564. These considerations reflect one of the primary purposes of the Malpractice Act, that of making "available professional liability insurance at a reasonable cost, and to establish a system through which a person who has sustained injury or death as a result of tort or breach of contract by a health care provider can obtain a prompt determination and adjudication of his claim. . . ." Section 102 of the Malpractice Act, 40 P.S. § 1301.102. See also *Hershey Medical Center v. Commonwealth*, 788 A.2d 1071, 1078 (Pa. Cmwlth.2001).

Based upon the foregoing discussion, we conclude that both the CAT Fund and the Guaranty Association are compliant with both statutory requirements and appellate decisions. Accordingly, the Petitioner's application for summary relief is denied, and the Respondents' applications for summary relief are granted.

### ORDER

AND NOW, this 31st day of May 2002, the Petitioner's application for summary judgment in the above-captioned matter is denied, and the Respondents' respective applications for summary judgment are granted.