23 A.3d 506

Steven B. HEIM, as Assignee of Robert O. Detweiler, D.O. and Detweiler Family Medicine and Associates, P.C., Appellees

v.

MEDICAL CARE AVAILABILITY AND REDUCTION OF ERROR FUND, Appellant.

Supreme Court of Pennsylvania.

Argued Dec. 1, 2010.

Decided April 28, 2011.

2

Zella Smith Anderson, Paul Dorman, Elit R. Felix, Philadelphia, Tawny Kay Mummah, MCare Fund, for Medical Care Availability and Reduction of Error Fund.

Stephen Edward Raynes, Raynes McCarty, Anthony P. Tabasso, Klehr, Harrison, Harvey, Branzburg & Ellers, L.L.P., Joseph Z. Traub, Raynes McCarty, Philadelphia, for S. Heim, as assignee of Robert O. Detweiler, DO & Detweiler Family Medicine Assoc. PC.

Richard S. Watt, Kerns, Pearlstine, Onorato & Hladik, L.L.P., Lansdale, for Robert O. Detweiler.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## *OPINION*

Justice SAYLOR.

The outcome of this direct appeal turns on the interplay among the statutory schemes providing healthcare providers with protection from excess liability and insurer insolvency and the doctrine of joint and several liability.

In 1998, Stephen B. Heim commenced a professional liability action against physician Robert O. Detweiler, D.O.; his family medical practice of Detweiler Family Medicine and Associates, P.C.; and employee-physician Stephen J. Carver, D.O. Proceeding individually and as an estate administrator, Mr. Heim alleged that the doctors' negligent services, from 1992 through 1996, caused the death of his wife.

In August 2000, upon trial, Mr. Heim secured a verdict of over $1 million. The jury attributed a substantial percentage of fault to Mrs. Heim and apportioned the remaining liability among the defendant physicians.

With delay damages, a molded verdict of approximately $707,000 was entered against all defendants, for which they

bore liability jointly and severally. *See Maloney v. Valley Med. Facilities, Inc.*, 603 Pa. 399, 416, 984 A.2d 478, 489 (2009) ("Joint tortfeasors generally are jointly-and-severally liable for the entire amount of a verdict, albeit that a jury may assign only a portion of fault to each."). Subsequently, the judgment on this verdict was affirmed on the defendants' appeal. *See Heim v. Carver*, 850 A.2d 19 (Pa.Super.) (table), *appeal denied*, 581 Pa. 700, 864 A.2d 1205 (2004).

At the time of the events underlying the litigation, Drs. Detweiler and Carver each maintained primary professional liability coverage in the amount of $200,000 per occurrence under a policy issued by a private insurer, as required under the Health Care Services Malpractice Act.[1] *See* 40 P.S. § 1303.701(a)(1) (superseded). On account of this primary insurer's subsequent insolvency, however, claims under the policy were assumed by the Pennsylvania Property and Casualty Association ("PPCIGA"), subject, *inter alia*, to a $300,000 per-claimant limitation. *See id.* § 991.1803(b). By virtue of a monetary payment—which, coupled with a statutory setoff which is not presently in dispute, amounted to $300,000—it has been agreed for purposes of this litigation that PPCIGA satisfied its own responsibility in this regard.[2] Significantly, however, the primary insurer's obligation related to the *Heim* case exceeded this statutory cap by $100,000, which was attributed to Dr. Carver's share of the verdict.[3]

Also when the cause of action accrued, under the HCSMA, excess liability protection was provided to health care providers through a government-run contingency fund known as the

1. Act of Oct. 15, 1975, P.L. 390, No. 111 (as amended 40 P.S. §§ 1301.101–1301.1006) (superseded) (the "HCSMA").

2. Since the PPCIGA cap is administered on a per-claimant basis, it is unclear from the submissions here why Drs. Detweiler and Carver were not each entitled to up to $300,000 of protection under PPCIGA's enabling statute. *See generally Bell v. Slezak*, 571 Pa. 333, 343–45, 812 A.2d 566, 571–73 (2002) (discussing the concept of a "covered claim" under the PPCIGA scheme).

3. According to the parties, PPCIGA allocated $200,000 of the $300,000 payment/setoff figure on behalf of Dr. Detweiler and $100,000 on account of Dr. Carver, albeit the rationale supporting the division is not provided.

Medical Professional Liability Catastrophe Loss Fund (the "CAT Fund"). *See* 40 P.S. § 1303.701(d) (superseded) (delineating the CAT Fund's general responsibility to pay judgments against qualifying health care providers in excess of the provider's primary coverage, subject to a $1,000,000 per occurrence cap). Under the specific terms of the governing statute, the CAT Fund was responsible to pay the judgment against each of Drs. Detweiler and Carver to the extent the judgment *"exceeds its [or his] basic coverage insurance* in effect at the time of the occurrence[.]" *Id.* (emphasis added).[4] In 2002, the CAT Fund's statutory liabilities were transferred to the Medical Care Availability and Reduction of Error Fund (the "MCARE Fund" or the "Fund"), per the Medical Care Availability and Reduction of Error Act.[5]

Relative to the *Heim* case, the Fund determined that it had no responsibility to redress the $100,000 shortfall in primary insurance benefits occasioned by the primary insurer's insolvency and the manner in which the PPCIGA cap was administered. Thus, consistent with the law of joint and several liability, Mr. Heim elected to commence execution proceedings against assets of Dr. Detweiler and his practice group to recover the unpaid portion of his judgment, including the $100,000 attributed to Dr. Carver, as well as attendant delay damages and post-judgment interest.

Dr. Detweiler and the medical group, for their parts, commenced a declaratory judgment action against the Fund and Mr. Heim in the Commonwealth Court, challenging the Fund's position relative to the $100,000 shortfall. During the course of the declaratory judgment proceedings, Mr. Heim reached a settlement with Dr. Detweiler and the practice and, via an

4. The associated definition of "health care provider" subsumed individuals such as physicians. *See* 40 P.S. § 1303.103 (superseded). Thus, the statute's reference to "its" basic coverage insurance should naturally be read as "his" or "her" primary insurance when applied to such individuals.

5. Act of March 20, 2002, P.L. 154, No. 13 (as amended 40 P.S. §§ 1303.101–1303.1115) (the "MCARE Act"). The Court recently reviewed the statutory framework for the CAT Fund and the MCARE Fund in *Fletcher v. PPCIGA*, 603 Pa. 452, 467–75, 985 A.2d 678, 688–92 (2009).

associated assignment of the latter's claims, Mr. Heim assumed the role of the petitioner. Furthermore, he took the position that the Fund's liability to him (by virtue of the assignment) was $125,000, or the amount of the settlement payment.[6]

Upon the parties' submission of a stipulation of facts and cross-motions for summary judgment, the Commonwealth Court entered judgment in Mr. Heim's favor. In a single-judge memorandum opinion, the intermediate court pronounced that the outcome was controlled by the doctrine of joint and several liability. Initially, it referenced *Carrozza v. Greenbaum*, 591 Pa. 196, 916 A.2d 553 (2007), for the proposition that PPCIGA is treated the same as the insurer it replaces for purposes of such doctrine. Then, the court concluded, somewhat cryptically, that "the applicability of joint and several liability equally applies to the MCARE Fund for the same reasons given by our Supreme Court in that case." *Heim v. MCARE Fund*, No. 358 M.D.2004, *slip op.* at 9 (Pa.Cmwlth.Jan.21, 2010) (Pellegrini, J.).

The Fund lodged the present direct appeal in this Court. It maintains that, as a straightforward matter of statutory construction, it is simply not authorized to compensate for shortfalls arising on account of primary insurer insolvencies. The Fund reasons that, by definition, it provides (and its predecessor provided) protection against liability in "excess" of "basic coverage insurance" (under the statutory framework delineating CAT Fund obligations, 40 P.S. § 1303.701(d) (superseded)), or "basic insurance coverage" (under the MCARE Act, *id.* § 1303.712(a)). The Fund highlights that the intermediate appellate courts have confirmed its position in the above regards in several decisions, applying the following logic:

It is clear that the CAT Fund provides only excess coverage. In other words, it is liable to pay claims only when the health care provider's liability exceeds its basic coverage.... To require the CAT Fund to cover the amount of

6. In all events, the Fund's liability turns on its statutory obligations relative to the underlying judgment in the malpractice action, which is the subject of the parties' arguments and our discussion below.

PPCIGA's setoff would, in effect, require the CAT Fund to pay for claims below the limits of the health care provider's basic insurance coverage. This would violate the express terms of the Health Care Services Malpractice Act, 40 Pa.C.S.A. § 1301.701(d).

*Storms v. O'Malley,* 779 A.2d 548, 567 (Pa.Super.2001); *accord Gabroy v. CAT Fund,* 886 A.2d 716, 720 (Pa.Cmwlth.2005), *aff'd per curiam,* 590 Pa. 277, 912 A.2d 768 (2006); *Elliott–Reese v. CAT Fund,* 805 A.2d 1253, 1257–58 (Pa.Cmwlth.2002), *aff'd per curiam,* 574 Pa. 705, 833 A.2d 138 (2003). In all relevant regards, the Fund discerns no differences in the governing statutory framework pre-and post–2002, when the MCARE Act was effectuated.

The Fund further notes the absence of any discussion of *Storms* and *Gabroy* within the Commonwealth Court's truncated legal analysis, although both decisions were put prominently before the court. To the extent the intermediate court referred to *Elliott–Reese,* in passing, in a footnote, the Fund argues that the court both misconstrued the holding and misunderstood the facts of the *Heim* case.

As to the doctrine of joint and several liability and *Carrozza,* once again, the Fund contends that the plain language of the MCARE Act controls. *See* Brief for the Fund at 16–17 ("Heim's strained reliance on [*Carrozza* ] fails altogether when ... he treats this Court's handling of an ambiguity in the Guaranty Association's statute as somehow analogous, in ways he never explains, to how this Honorable Court should now handle the plain and unambiguous terms of the Mcare Act that prescribe the Fund's non-responsibility for the primary insurance company's basic insurance limits.").[7] Finally, the Fund asserts that public policy militates in its favor, given the

7. The Fund does acknowledge that its obligations would have been impacted by the doctrine of joint and several liability had the unpaid portion of the verdict allocated to Dr. Carver fallen within the excess coverage provided by the MCARE Fund, and to the degree Dr. Detweiler's excess limits were unexhausted. *See* Brief for the Fund at 18–19 ("[I]n appropriate circumstances involving excess coverage, the Mcare Fund does pay joint and several liability, but it does not 'drop down' to pay unpaid primary limits.").

importance of conserving its assets to the effective perform-
ance of its public role. *Cf. Hershey Med. Ctr. v. CAT Fund,*
573 Pa. 74, 82–83, 821 A.2d 1205, 1210–11 (2003) (discussing
the occasion and necessity for the HCSMA).

Mr. Heim, on the other hand, highlights that neither the
now-supplanted provisions of the HCSMA nor the MCARE
Act provides a method for calculating the Fund's obligations
when liability is apportioned among multiple tortfeasors. Ac-
cording to Mr. Heim, therefore, *Carrozza* dictates the appro-
priate outcome, namely, that the doctrine of joint and several
liability should prevail over the Fund's construction of the
MCARE Act.

As the Fund indicates, our present task is to interpret the
governing statutory framework, as to which our review is
plenary. *See, e.g., In re Erie Golf Course,* 605 Pa. 484, 502,
992 A.2d 75, 85 (2010).

At the outset, the Fund presents a strong argument that
the HCSMA did not, and does not, authorize it to compensate
for a shortfall arising from an insurer insolvency undermining
a health care provider's *own* line of primary coverage. This
was, in fact, the subject of the *Storms* opinion. *See Storms,*
779 A.2d at 567 ("To require the CAT Fund to cover the
amount of PPCIGA's setoff would, in effect, require the CAT
Fund to pay for claims below the limits of *the health care
provider's* basic insurance coverage." (emphasis added)). The
decision in *Elliott–Reese* also operated on the same principle.
*See Elliott–Reese,* 805 A.2d at 1257–58 ("It is clear that the
CAT Fund provides only excess coverage." In other words,
the CAT Fund was liable to pay claims only "when the *health
care provider's liability* exceeds *its* basic coverage." (emphasis
modified)).

We regard it as a separate matter, nonetheless, when the
deficiency is in the primary coverage of *another* health care
provider, chargeable to the physician-claimant only on account
of joint and several liability.

Preliminarily, there is a potentially significant difference in
the statutory language of the HCSMA pre-and post-implemen-

tation of the MCARE Act. The previous statute expressly directed that the excess protection provided by the CAT Fund was to be measured from the baseline of the provider-in-issue's *own* primary coverage. *See* 40 P.S. § 1301.701(d) (superseded) (rendering the CAT Fund responsible to satisfy provider liability to the extent it "exceeds *its* [or his] basic coverage insurance in effect at the time of the occurrence" (emphasis added)); *see also supra* note 4. The analogue provision of the MCARE Act, however, does not (at least explicitly) indicate that the primary insurance coverage establishing the excess coverage baseline is that of the provider-in-issue. *See id.* § 1303.712(a) (establishing MCARE liability for losses or damages awarded "in excess of *the* basic insurance coverage" (emphasis added)).

Application of the MCARE Act, then, may require a deeper inquiry. Nevertheless, in the present matter, the underlying liabilities were incurred, and a judgment was issued, under the regime of the CAT Fund, and the liabilities were later merely assumed by the MCARE Fund. *See* 40 P.S. § 1303.712(b). Thus, the earlier enactment establishes the limits of those liabilities, and we find no ambiguity in the statute's establishment of a provider's *own* primary coverage as the boundary between what is primary and what is excess relative to that provider. *See id.* § 1301.701(d) (superseded).[8]

We realize (as the Fund stresses) that in *Gabroy,* the Commonwealth Court extended *Storms* to a scenario very similar to the present one, *see Gabroy,* 886 A.2d at 720, thus supporting the Fund's position that the floor of its excess coverage obligation is determined by the aggregate primary coverage associated with a judgment against joint tortfeasors. We also appreciate that this Court affirmed that decision via *per curiam* order. *See Gabroy,* 590 Pa. 277, 912 A.2d 768 (2006).

8. Parenthetically, the MCARE's present position that the salient provisions of the pre-and post-amendment HCSMA are materially the same may bear on the appropriate construction of Section 1303.712(a), although further assessment in this regard is beyond the scope of the present opinion.

██ Nevertheless, a *per curiam* order does not serve as binding precedent. *See Commonwealth v. Thompson,* 604 Pa. 198, 213, 985 A.2d 928, 937 (2009) ("This Court has made it clear that *per curiam* orders have no *stare decisis* effect.").[9] Thus, regardless of the reasons for the majority decision of this Court in *Gabroy,* we are free to evaluate this case on the substantive merits.

We also recognize the policy concerns raised by the Fund, but those considerations are mixed, since the HCSMA plainly creates a remedial scheme designed to supply financial protection for health care providers. Accordingly, as in any other instance in which the Legislature has struck a balance between competing social policies, its chosen methods are best determined by the language of the enactment.

██ In summary, under the statutory scheme governing CAT Fund liabilities, the CAT Fund's excess coverage responsibility to a health care provider was measured from the baseline of such provider's own primary coverage. In the present case, the floor was Dr. Detweiler's $200,000 "basic coverage insurance" (as it was denominated by the HCSMA, 40 P.S. § 1301.701(d) (superseded)). Therefore, such liability as Dr. Detweiler bore for the shortfall in Dr. Carver's primary coverage, as well as associated delay damages and pre-judgment interest, fell within the CAT Fund's excess coverage obligation relative to Dr. Detweiler. *See supra* note 7. The responsibility for this now falls to the MCARE Fund, *see* 40 P.S. § 1303.712(b), with the benefits inuring to Dr. Detweiler, and, derivatively, to Mr. Heim.

Finally, we acknowledge that Mr. Heim has not advanced a specific argument predicated on the distinct language of the statutory scheme governing the CAT Fund. Nevertheless, as the appellant challenging a presumptively valid judgment, the Fund has rested its argument on the plain terms of the governing statutory framework, which is the basis for our

**9.** It is also noteworthy that several Justices dissented to the *per curiam* affirmance in *Gabroy,* in favor of oral argument, while tending toward the health care provider's position. *See Gabroy,* 590 Pa. at 278–81, 912 A.2d at 768–70 (Baer, J., joined by Saylor, J.).

decision. Moreover, Mr. Heim, as the appellee, did not bear the burden of issue preservation. *See Commonwealth v. Moore*, 594 Pa. 619, 638, 937 A.2d 1062, 1073 (2007) (explaining that "an appellate court may affirm a valid judgment based on any reason appearing as of record, regardless of whether it is raised by the appellee").

The order of the Commonwealth Court is affirmed.

Chief Justice CASTILLE, Justices EAKIN, BAER, TODD, McCAFFERY and ORIE MELVIN join the opinion.