**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, MCCAFFERY, STEVENS, JJ.**

| | | |
|---|---|---|
| IN RE:  NOMINATION PETITION OF ROBERT GUZZARDI FOR THE REPUBLICAN NOMINATION FOR GOVERNOR OF PENNSYLVANIA IN THE REPUBLICAN PRIMARY OF MAY 20, 2014 | : : : : : : : | No. 29 MAP 2014<br><br>Appeal from the Order of the Commonwealth Court at No. 158 MD 2014 dated 4/15/14 |
| APPEAL OF:  RICHARD W. STEWART, ROBERT K. ROBINSON, RICHARD TEMS AND DONNA M. COSMELLO | : : : : | SUBMITTED:  April 21, 2014 |

**OPINION**

**MR. JUSTICE SAYLOR**          **DECIDED:  May 1, 2014**
                                        **OPINION FILED:  August 18, 2014**

Given time constraints associated with an impending primary election contest, the present election appeal was previously resolved via per curiam Order.  See In re Nomination Petition of Guzzardi, ___ Pa. ___, 91 A.3d 701 (2014) (directing that Appellee Robert Guzzardi's name be stricken from the primary ballot for the Republican Party nomination for the Office of Governor of Pennsylvania).  With the exigency abated, we are now able to supplement the brief explanation provided in our Order with the discussion that follows.  Primarily, we have determined that Pennsylvania courts are not empowered to employ principles of equity to override the express statutory command that the failure of a candidate for statewide public office to file a timely statement of financial interests with the Pennsylvania State Ethics Commission "shall . . . be a fatal defect to a petition to appear on the ballot."  65 Pa.C.S. §1104(b)(3).

Per the Public Official and Employee Ethics Act,[1] candidates for state-level public office must file a statement of financial interests with the Ethics Commission on or before the last day for filing a petition to appear on the ballot for the election. See 65 Pa.C.S. §1104(b)(1). The General Assembly has provided for strict enforcement of this requirement, on pain of disqualification from ballot access. Specifically, the Legislature has prescribed:

> Failure to file the statement [of financial interests] in accordance with the provisions of this chapter shall, in addition to any other penalties provided, be a fatal defect to a petition to appear on the ballot.

Id. §1104(b)(3).

On March 10, 2014, in conformity with the Election Code,[2] Robert Guzzardi filed a timely nomination petition with the Department of State, seeking placement of his name on the ballot for the Republican nomination for the Office of Governor. See 25 P.S. §2867. Although an original statement of financial interests was appended to this petition, Mr. Guzzardi failed to make the mandatory tender to the Ethics Commission prior to the statutory deadline.

Appellants, qualified electors and registered voters, filed a petition to set the nomination petition aside in the Commonwealth Court. See 25 P.S. §2937; 42 Pa.C.S. §764. Among other challenges, they invoked the statutory fatal-defect rule which, by its plain terms, required Mr. Guzzardi's name to be removed from the primary election ballot, in light of his undisputed failure to file a timely statement of financial interests with

---

[1] Act of October 15, 1998, P.L. 729, No. 93 (as amended 65 Pa.C.S. §1101-1113) (the "Ethics Act").

[2] Act of June 3, 1937, P.L. 1333, No. 320 (as amended 25 P.S. §§2600-3591).

the Ethics Commission. The Commonwealth Court, however, refused to enforce the governing legislative directive.

Rather, the single judge administering the matter conducted a hearing and issued an order denying Appellants' objections. In an unpublished opinion, she relied on a line of Commonwealth Court decisions which have found the judiciary to be possessed with the power to permit a fatal defect to be "cured" through the application of equitable principles. See, e.g., In re Nomination Petition of Howells, 20 A.3d 617, 621-22 (Pa. Cmwlth.), aff'd per curiam, 611 Pa. 559, 28 A.3d 915 (2011). In this regard, it was the court's position that Mr. Guzzardi had offered sufficient, non-negligent explanations to justify treating his late-filed statement nunc pro tunc, or as if it had been submitted to the Ethics Commission on time.[3]

Upon Appellants' direct appeal to this Court, they cited In re Petition of Cioppa, 533 Pa. 564, 626 A.2d 146 (1993) (plurality), where, twenty years ago, the lead opinion characterized the fatal-defect provision as being clear, unambiguous, mandatory, and unyielding. See id. at 571, 626 A.2d at 149 ("[H]ereafter failure to file the requisite financial interests statement within the prescribed time shall be fatal to a candidacy."). In this regard, Appellants emphasized the Cioppa plurality's admonitions that, through the fatal-defect rule, the General Assembly had "foreclosed the possibility for curing" and "foreclosed our inquiry into the individual circumstances which may have

---

[3] The nature of these accepted explanations is not germane to our resolution of this appeal. Nevertheless, by way of background, the Commonwealth Court found that an aide to Mr. Guzzardi was misled by an unidentified "young woman with dark brown hair" in the offices of the Department of State into believing that filing a statement of financial interests with the Ethics Commission was unnecessary. In re Nomination Petition of Guzzardi, 158 M.D. 2014, slip op. at 26 (Pa. Cmwlth. Apr. 15, 2014). The court also faulted the Department of State for accepting an original of the statement of financial interests with the nomination petition, positing that the agency bore responsibility to return the original to Mr. Guzzardi and request a copy in its place. See id. at 33.

contributed to the untimely filings." Id. at 569, 626 A.2d at 149. According to Appellants, such understanding was recently solidified by a majority opinion in In re Nomination of Paulmier, 594 Pa. 433, 444-45, 937 A.2d 364, 370-71 (2007) (referencing Cioppa in holding that "the fatality rule announced in Section 1104 of the Ethics Act was intended by the Legislature to bar . . . those candidates from the ballot who fail to file statements of financial interests or who file them in an untimely manner."). Appellants also explained that the requirement to file timely financial statements with the Ethics Commission furthers an important legislative objective, namely, protecting the integrity of the election through the Commission's substantive evaluation of the contents of such statements. See 65 Pa.C.S. §1107(5) (requiring the Commission to "[i]nspect statements of financial interests which have been filed in order to ascertain whether any reporting person has failed to file such a statement or has filed a deficient statement").

In response, Mr. Guzzardi posited that the strict requirements of the Ethics Act must be balanced with the liberal construction required, in election cases, in favor of ballot access. See Paulmier, 594 Pa. at 445, 937 A.2d at 371. Mr. Guzzardi believed that the Commonwealth Court's invocation of equitable principles opening the possibility for the "cure" of fatal defects is consistent with the "spirit of the Ethics Act." Brief for Appellee at 12. He suggested that his filing with the Department of State represented substantial compliance with the Ethics Act's requirement for filing with the Commission, and he asserted that neither Appellants nor the general public suffered any prejudice.

On an expedited basis, we undertook plenary review of the legal issue of whether equity lies to override disqualification from ballot access as dictated by statute. In further development of our holding that recourse to equity is not available toward such end, we begin with the derivation of the statutory fatal defect rule.

In State Ethics Commission v. Baldwin, 66 Pa. Cmwlth. 40, 444 A.2d 767, rev'd, 498 Pa. 255, 445 A.2d 1208 (1982), superseded by statute as recognized in Cioppa, 533 Pa. at 569, 626 A.2d at 148-49, the Commonwealth Court determined that the failure to file a timely statement of financial interests with the Ethics Commission was, as this Court put it, a "fatal defect." Baldwin, 498 Pa. at 259, 445 A.2d at 1210 (characterizing the Commonwealth Court's reasoning in the underlying case). On appeal, this Court found such approach to be "stilted and harsh" and rejected it in favor of a more liberal treatment allowing for amendments to remedy deficiencies, at least in the absence of intent on the part of a candidate to defraud. Id.

The Court's disapproval of the fatal-defect rule, however, represented only an exercise in statutory construction. See id. ("We are satisfied that a correct analysis [of Section 1104(b)'s predecessor] does not reflect a legislative intent requiring the stilted and harsh ruling reached by the Commonwealth Court in this case." (emphasis added)). It is material, then, that in 1989, the Legislature specifically overrode the Court's construction by amending the Ethics Act to make explicit that it did, in fact, envision a strict filing requirement on pain of disqualification. See Act of June 26, 1989, P.L. 26, No. 9, §4(b)(3) ("Failure to file the statement in accordance with the provisions of this act shall . . . be a fatal defect to a petition to appear on the ballot.") (recodified, as amended, at 65 Pa.C.S. §1104(b)(3)).

Difficulties ensued in implementing this amendment, which obviously called for results with which the Court had expressed strong discomfort. On the one hand, this Court interpreted the statutory fatal-defect rule to require filing of statements of financial interests "in accordance with the provisions of this chapter," 65 Pa.C.S. §1104(b)(3), that is, all the provisions of Chapter 11 of the Ethics Act. Since Chapter 11 sets forth the required content for statements of financial interests, deficiencies in substantive

disclosures on timely filed statements were deemed disqualifying. See, e.g., In re Nomination Petition of Littlepage, 589 Pa. 455, 464, 909 A.2d 1235, 1240-41 (2006) (holding that the statutory fatal-defect provision barred a candidate from ballot access, in light of his failure to disclose income derived from rental properties in his statement of financial interests); In re Braxton, 583 Pa. 35, 874 A.2d 1143 (2005) (per curiam) (holding that a candidate's failure to disclose sources of rental income and the names and addresses of creditors on a statement of financial interests required removal from the ballot, per Section 1104(b)(3)); In re Nomination Petition of Anastasio, 820 A.2d 880, 881 (Pa.Cmwlth.) (holding that the fatal-defect rule was disqualifying relative to a candidate who failed to disclose sources of income on a statement of financial interests), aff'd per curiam, 573 Pa. 512, 827 A.2d 373 (2003). On the other hand, the Court acted to temper the fatal-defect provision by permitting amendments for technical defects appearing on the face of financial statements, where, otherwise, substantial compliance with the requirements of the Ethics Act could be found. See, e.g., In re Nomination Petition of Benninghoff, 578 Pa. 402, 414, 852 A.2d 1182, 1189 (2004) (rejecting the position that a candidate's failure to list the Commonwealth as a direct source of income on a statement of financial interests was a fatal defect, where the candidate had otherwise disclosed his status as a state representative). Ultimately, in light of continuing tension between these lines of cases, the Court disavowed the decisions applying Section 1104(b)(3)'s fatal-defect rule to content-based deficiencies, limiting the rule's application to instances in which candidates fail to file statements of financial interests or do not meet the statutory filing deadline. Paulmier, 594 Pa. at 445-46, 937 A.2d at 370-71.

As such, application of the fatal-defect command is now sharply limited. Within the narrow ambit of the rule's remaining purview, however, the courts are not free to

disregard the explicit legislative direction based on equitable considerations. Baldwin manifested this Court's belief that the General Assembly would have intended for such considerations to be taken into account, see Baldwin, 498 Pa. at 259, 445 A.2d at 1210, but the Legislature's response was to dictate precisely the opposite, see Act of June 26, 1989, P.L. 26, No. 9, §4(b)(3) (recodified, as amended, at 65 Pa.C.S. §1104(b)(3)). Even if the words chosen by the Legislature, i.e., "fatal defect," did not make it plain enough, this history confirms that the application of equitable principles is manifestly contrary to legislative intent.

Elections are appropriately regulated by the political branch precisely because they are inherently political. This essential legislative governance fosters orderly, efficient, and fair proceedings. In this regard, statutory filing requirements and attendant deadlines "ensure the orderly functioning of the primary-election timetable so that those responsible will have sufficient time to prepare the ballot properly." Gomes v. Rhode Island State Bd. of Elections, 393 A.2d 1088, 1090 (R.I. 1978).

Out of respect for the political branch and for the sake of regularity and orderliness in the election process, the Supreme Court of Connecticut recently held that courts cannot exercise equitable powers to mitigate harsh results in derogation of legislative requirements for strict compliance with election-related deadlines. See Butts v. Bysiewicz, 5 A.3d 932, 947 (Conn. 2010). Initially, the court explained:

> We note that it long has been settled in other jurisdictions that statutes employing [mandatory] language in filing deadlines for ballot access are deemed mandatory, and that, with limited exceptions not implicated in the present case, strict compliance is required such that neither the election official nor the court can excuse a candidate's inadvertent noncompliance.

Id. at 940 (citing 26 AM. JUR. 2D ELECTIONS §216 (2004), Andrews v. Secretary of State, 200 A.2d 650, 651 (Md. 1964), and Smith v. Kiffmeyer, 721 N.W.2d 912, 914-15 (Minn.

2006)) (footnote omitted); accord Foster v. Evert, 751 S.W.2d 42, 44 (Mo. 1988) ("[E]lection contest statutes are a code unto themselves. The procedures there established are 'exclusive and must be strictly followed as substantive law.'" (quoting Hockemeier v. Berra, 641 S.W.2d 67, 69 (Mo. 1982)). Addressing the role of the judiciary's equitable powers, the Connecticut court quoted as follows from a responsive opinion in a decision of a Michigan appeals court, later adopted by the Supreme Court of Michigan:

> Equity only applies in the absence of a specific statutory mandate . . .. [I]t is not [a court's] place to create an equitable remedy for a hardship created by an unambiguous, validly enacted, legislative decree . . .. This should be particularly true of election law. If this [c]ourt were to erode the statutory requirements of election law through the use of equity, we would create ambiguity and inconsistency in what needs to be a uniform and stable area of law.

Butts, 5 A.3d at 943 n.16 (quoting Martin v. Secretary of State, 760 N.W.2d 726 (Mich. Ct. App. 2008) (O'Connell, J., dissenting)); see Martin v. Secretary of State, 755 N.W.2d 153, 154 (Mich. 2008) (adopting the salient reasoning of Judge O'Connell's dissent on appeal); accord Repsold v. Indep. Sch. Dist. No. 8, 285 N.W. 827, 829 (Minn. 1939) ("[C]ourts should be reluctant to interfere with political matters by granting equitable relief [outside the scope of election contest statutes].").

We agree with the Supreme Courts of Connecticut and Michigan that the judiciary should act with restraint, in the election arena, subordinate to express statutory directives. Subject to constitutional limitations, the Pennsylvania General Assembly may require such practices and procedures as it may deem necessary to the orderly, fair, and efficient administration of public elections in Pennsylvania. At least where the Legislature has attached specific consequences to particular actions or omissions, Pennsylvania courts may not mitigate the legislatively prescribed outcome through

recourse to equity. The Commonwealth Court's contrary approach, as manifested in the <u>Howells</u> line of decisions is therefore disapproved.[4]

With regard to Section 1104(b)(3), quite obviously, the Legislature could have provided that the filing of a statement of financial interests with the Ethics Commission may be deemed timely where candidates are able to demonstrate ostensible non-negligent reasons for failing to meet the statutory deadline. Nevertheless, it did not do so -- instead, the Assembly pronounced a bright-line rule couched in strong admonitory terms. Respectfully, contrary to the dissents' claims to a reasonable counter-interpretation, "fatal" and "curable" are simply antonyms.[5]

---

[4] Although this Court affirmed the Commonwealth Court's order in <u>Howells</u> via <u>per curiam</u> order, unexplained orders of this variety do not necessarily reflect this Court's approval of the reasoning applied. In any event, <u>per curiam</u> orders do not serve as binding precedent, <u>see</u>, <u>e.g.</u>, <u>Heim v. MCARE Fund</u>, 611 Pa. 1, 9, 23 A.3d 506, 510 (2011), which should be grounded on developed reasoning.

The dissent references a case arising under the Unemployment Compensation Law, 43 P.S. §§751-914, in support of its proposition that <u>nunc</u> <u>pro</u> <u>tunc</u> principles should apply, despite the occurrence of a "fatal defect" under governing statutory law. <u>See</u> Dissenting Opinion, <u>slip</u> <u>op.</u> at 7-8 (Baer, J.). Of course, there is no fatal-defect provision in the Unemployment Compensation Law.

[5] Since the present situation is vastly different from the "natural disaster, fire, or bomb threat" scenarios envisioned by the dissent, <u>see</u> Dissenting Opinion, <u>slip</u> <u>op.</u> at 10 (Baer, J.), we do not address those here. We reiterate, however, that judicial enforcement of the fatal-defect rule extends only to the limits of the federal and state Constitutions and recognize that such enforcement in impossibility scenarios may test such boundaries.

In response to Madame Justice Todd's remarks, we have no intention of distinguishing among real and/or hypothetical events in terms of the unavailability of equitable relief. We have only taken the opportunity to reply to the dissents' suggestion that courts should undertake equitable review, circumventing a clear and express statutory command, merely because it is possible to conceive of exceptional circumstances in which enforcement of the disability might be viewed as extreme. Notably, Justice Todd offers no authority supporting her position that conjectural constitutional impingements
(continued . . .)

Although our enforcement of the governing statutory fatal-defect rule was dispositive of this appeal, we take this opportunity to respond to the dissents' assertion that this case presents "non-negligent" and "extraordinary" circumstances and a "breakdown in the administrative process." Dissenting Opinion, slip op. at 2, 6 (Baer, J.). In our view, the attachment of such labels in the scenario reflected in the present record is problematic, particularly since it sets a very low threshold for what is to be considered non-negligent and exceptional.

In this regard, at the hearing before the Commonwealth Court, Mr. Guzzardi straightforwardly acknowledged that he had not read the statutory requirement relative to the filing of a statement of financial interests, see N.T., April 3, 2014, at 199, and either did not read or did not apprehended explicit directions contained on the prescribed form which he had completed, see N.T., April 2, 2014, at 183-84, 198-200; N.T., April 3, 2014, at 199-200 ("I think I said that I read it but did not understand or comprehend."). Thus, according to his own testimony, from the beginning Mr. Guzzardi

---

(. . . continued)

arising from a statute's application in unrealized and unusual circumstances should curtail its enforcement across the wide array of the more ordinary (yet substantially exigent and disruptive), real election controversies which the statute was obviously designed to redress. In our view, such manner of analysis demonstrates an insensitivity to the plain meaning of legislative enactments, their underlying purposes, and the strong presumption of constitutionality which they enjoy.

Indeed, this Court has long maintained that, "[w]hile we strive to interpret statutes in a manner which avoids constitutional questions, we will not ignore the plain meaning of the statute to do so." Housing Auth. of Chester Cnty. v. CSC, 556 Pa. 621, 644, 730 A.2d 935, 948 (1999). One obvious purport of this settled, restrained, deferential approach centered upon the will of the Legislature is that, to the degree individual rights might be impinged by a clearly-written statute in imagined and extraordinary cases, vindication of those rights is left to future as-applied challenges to the enactment as these may arise. The alternative approach of undercutting a straightforward legislative directive and its purposes throughout the statute's broad-scale application has long been rejected by the courts.

had no intention to file an original statement of financial interests with the Ethics Commission:

> Q.  [W]as it your intent to file the statement of financial interests with the Ethics Commission on Monday, March 10th?
>
> A.  No.
>
> Q.  Why wasn't it your intent to do that?
>
> A.  I didn't know that I had to do it.  In fact, I thought that the intake process was a screening process so that I met the minimum requirements for ballot access.  So I thought when I was done with that that I was done. . . .

N.T., April 3, 2013, at 192.  In point of fact, Mr. Guzzardi candidly assumed responsibility for his failure in such regard:

> Q:  . . . [Y]ou did not, though, pay attention to the detail with the statement of financial interests, correct?
>
> A:  That's correct.  You're hammering me, but it's obvious I made a mistake.  I should have seen it.  It was there to be seen.  I didn't see it.  I made a mistake.  The record is what the record is.  You've correctly stated the record.
>
> *              *              *
>
> Q:  . . . Who was responsible in your campaign to file the statement of financial interests with the Ethics Commission?
>
> A:  Me.

N.T., April 2, 2014, at 189-190; N.T., April 3, 2014, at 202-03.

Upon these concessions alone, it seems clear to us that a finding of no negligence, on Mr. Guzzardi's part, is unsustainable.  The dissenting position apparently is grounded on the testimony from an aide to Mr. Guzzardi to the effect that, while at the Department of State, in a conversation with another person which was overheard by Mr.

Guzzardi, the aide had volunteered to take Mr. Guzzardi's statement of financial interests to the Ethics Commission. See N.T., April 2, 2014, at 234. The aide indicated that he was "stopped in [his] tracks," id. at 235, however, because a Department-of-State employee – described only as a young woman with dark hair, see id. at 238 -- told him this was unnecessary, see id. at 234-35. The aide also stated that he did not attempt to verify this information or discuss it with Mr. Guzzardi, because he "was not in command and control of the campaign," and was "not the candidate for governor." Id. at 241, 245. Furthermore, the aide denied having ever been instructed or asked to file Mr. Guzzardi's statement of financial interests. Id. at 245. Mr. Guzzardi, for his part, indicated that he did not overhear any conversation between the aide and the Department-of-State employee, see N.T., April 3, 2014, at 190, and, as previously indicated, he assumed responsibility for the filing of his own documents.

From our point of view, even if there was some miscommunication at the Department-of-State remote to Mr. Guzzardi,[6] this does not offset the underlying, self-acknowledged mistake on the part of the person who was "in command and control" and who was "the candidate for governor" in failing to apprehend, from the outset, the express statutory requirement to file a statement of financial interests with the Ethics Commission.[7] Particularly as Mr. Guzzardi took responsibility for his failure in this

---

[6] The objectors presented testimony from Department-of-State personnel which is in substantial tension with such finding, see, e.g., N.T., April 3, 2014, at 211-224; however, we recognize that the Commonwealth Court did make a credibility determination accepting the aide's testimony.

[7] As reflected above, the purport of Mr. Guzzardi's own testimony was not that he failed to file on account of misinformation gained from the Department of State; rather, it was that he failed to file because he misunderstood basic filing requirements which he should have apprehended from the outset. See, e.g., N.T., April 2, 2014, at 189-190.

regard, it is unclear why the dissents find this to be of no material significance to its assessment of his negligence.[8]

In summary, there is no dispute here that the statutory fatal-defect rule applied squarely in Mr. Guzzardi's circumstances, on account of his failure to timely file a statement of financial interests with the Commission. Moreover, Appellants lodged timely objections to his nomination petition, bringing the matter squarely before the Commonwealth Court. In the circumstances, the Commonwealth Court erred in refusing to enforce the governing statutory command.

---

[8] In its rejoinder, the dissents posit that the Commonwealth Court's ruling is insulated by a credibility determination rejecting Mr. Guzzardi's own testimony in favor of inconsistent evidence (presumably the testimony of Mr. Guzzardi's aide). See Dissenting Opinion, slip op. at 3 n.1 (Baer, J.). In point of fact, however, there is little if anything inconsistent as between the aide's recounting (including that he never was assigned by Mr. Guzzardi to file the statement of financial interests with the Ethics Commission and, accordingly, he never told Mr. Guzzardi upon hearing the filing was unnecessary), and Mr. Guzzardi's testimony (e.g., that he never appreciated from the outset that he was responsible to file his statement with the Ethics Commission, he never set out to do so, his aide never told him the filing was unnecessary, and, thus, based on his own mistake, he failed to accomplish the necessary filing). Indeed, in no way did the Commonwealth Court attempt to identify some conflict as between these two lines of evidence and credit one over the other. Rather, dispositionally, the court merely omitted any treatment of Mr. Guzzardi's own undisputed testimony reflective of his negligence. From our point of view, such analysis is grounded in abstraction, not closely rendered credibility based decision-making.

Since the Commonwealth Court did not affirmatively reject Mr. Guzzardi's own testimony, at best, the court's analysis reflects that the filing of Mr. Guzzardi's statement of financial interests would have occurred in spite of his undisputed misapprehension and mistake, had his aide not been remotely misinformed. From our point of view, such prevailing circumstances cannot be characterized aptly as non-negligent.

Moreover, these sorts of efforts to work around undisputed record evidence in support of a particular finding amply illustrate the shortcomings of applying equitable principles to circumvent the legislative fatal-defect rule, thus injecting "ambiguity and inconsistency in what needs to be a uniform and stable area of law." Butts, 5 A.3d at 943 n.16 (citation omitted).

Mr. Chief Justice Castille and Messrs. Justice Eakin, McCaffery and Stevens join the opinion.

Mr. Chief Justice Castille files a concurring opinion in which Mr. Justice Stevens joins.

Mr. Justice Baer files a dissenting opinion in which Madame Justice Todd joins.

Madame Justice Todd files a dissenting opinion.